# Hall *et al. v.* Mobile & Montgomery Railway Company.

### Bill to enforce Equitable Mortgage.

*Equitable mortgage; what constitutes; rights of parties under.*—The owner of lands conveyed them to a railroad company, expressly reserving in the deed what was denominated a "vendor's lien," to secure notes given for the purchase money, taking back at the same time from the purchasers, an irrevocable power of attorney, authorizing the vendor or transferrees to whom he should negotiate the notes, as attorney in fact of the company, and in its name, to sell from time to time so much of the property, as should be necessary to pay the notes at maturity, or the interest thereon, which was payable semi-annually. Afterwards, and before the maturity of the notes, creditors of the railroad company, having notice of the deed, holding bonds secured by mortgage covering after acquired property, of prior date to the conveyance of the lands, but inferior to the lien reserved, obtained a decree of foreclosure, under which they purchased all the property of the railroad, making payment in bonds thus secured, and thus-came into possession of the lands. The purchasers used the lands, collected rents, and refused to pay interest, although demanded of them, remaining in possession after the maturity of the notes, without offering to pay either. At that time the lands were insufficient to pay the amount due upon the purchase money, and the original vendor and vendee were both insolvent. The transferree of some of the notes thereon filed his bill to enforce the lien, and sought a decree against the last purchasers for use and occupation during the time they were in possession. *Held:*

1. The vendor and his transferrees of the notes acquired an equitable mortgage on the lands.

2. The bondholders were purchasers of the property for value, and lawfully in possession; but acquired only the equity of redemption, remaining after the reservation of the lien and the execution of the power of attorney; and in the absence of some stipulation or agreement to that effect in the contract of purchase, were not liable for the mortgage debt or interest thereon.

3. The purchasers were not liable for rents, or for use and occupation, not exceeding interest maturing during the possession, prior to a demand upon them for possession of the property, or its being taken from them by appointment of a receiver.

2. *Reports of officers to stockholders; for what, will not bind corporation.*—Neither the reports of officers of a corporation made to its stockholders, nor reports made to its directory, in which certain claims for which the corporation is not bound, are estimated as liabilities of¦ the corporation,¦will bind the corporation to pay either principal or interest of the debt, or prevent it from changing its purpose with regard thereto.

APPEAL from Chancery Court of Mobile.

Heard before Hon. H. AUSTILL.

This was a cross appeal, and cross assignment of error,

under the rules by consent of parties, on the record brought up on the appeal of the *Alabama Gold Life Insurance Company v. Hall et al.* That case is reported *ante*, p. 1, and involved the right to priority of satisfaction, between different persons to whom Perry, the vendor, transferred at different times, notes given by the Mobile and Montgomery *Railroad Company* for the purchase money of certain real property in Mobile.

The question in this case is, whether the Mobile and Montgomery *Railway* Company is bound in equity to make compensation, or pay rent, to the holders of these notes, (the land being insufficient to pay the amount due) during the period the latter company—which succeeded to the rights of the *railroad* company by purchase under a decree in chancery—remained in undisturbed possession and use of the property.

The case made by the pleadings and testimony with respect to the present appeal, is as follows:

On November 1st, 1871, N. W. Perry, who became insolvent before the filing of the bill, was the owner of the property in controversy, on which there were then certain liens, not material to be particularly noticed, in the view the court took of this case. On that day he sold and conveyed the property, by warranty deed, to the Mobile and Montgomery *Railroad* Company, reserving on the face of the deed a vendor's lien, for the payment of the purchase money, for which the *railroad* company executed its sixteen promissory notes, of even date with the deed. Each of these notes were payable in bank to the order of Perry. The first five notes were for five thousand dollars each, with interest from date, the last of which matured February 1st, 1872, and were all paid by the *railroad* company at maturity. The other notes were "five notes each for $10,000, with interest from date, and six notes each for five thousand dollars, with interest from date, the principal of the last named eleven notes being payable five years after date, with the interest thereon being payable semi-annually." Perry, on the same day, executed and delivered to the *railroad* company, his bond for title, conditioned, among other things, to obtain a proper conveyance of the interest of one Ida Jones, a minor, and to hold the *railroad* company and its successors harmless, against all damage arising out of the title of said Ida. On the same day, and as part of the same transaction, the *railroad* company executed a power of attorney to Perry, which recited the purchase, Perry's retention of a vendor's lien, and the date, amount, number, terms, and maturity of the notes, and continued:

"Now, in consideration of the premises and of one dollar by Nelson W. Perry paid to the Mobile and Montgomery Railroad Company for the purpose of enabling the said Nelson W. Perry *to enforce his* vendor's lien aforesaid without resorting to the courts, it has made, constituted and appointed the said Nelson W. Perry, and by these presents does hereby make, constitute and appoint the said Nelson W. Perry its true and lawful attorney for it, the said Mobile and Montgomery Railroad Company, and in its name, place and stead to sell the above described premises, or so much thereof as may be necessary, upon default in the payment of said notes or either of them, or the interest due thereon as aforesaid, and to make deed to the purchaser or purchasers in the name of said Mobile and Montgomery Railroad Company. * * * But in case said Nelson W. Perry shall have negotiated any of said notes before maturity, so that some other person shall be the lawful holder thereof; then said lawful holder of said note or notes may execute all the powers herein conferred on said N. W. Perry, so far as they may apply to such note or notes so held by such person, and in case of the death of said N. W. Perry, his executors, &c., may execute all the powers herein conferred. Both the deed and power of attorney were duly recorded.

Under this purchase the *railroad* company went into possession, changed some of the buildings to make them suitable for a depot, and used the property for that purpose. It paid the first five notes, and interest on the others up to the year 1874.

On the 25th of April, 1870, the *railroad* company executed its mortgage, to certain trustees to secure an issue of bonds, upon all the property it then had or might thereafter acquire. The *railroad* company became insolvent in 1873, and the trustees filed a bill for foreclosure in the Chancery Court at Montgomery. A decree was obtained, under which all the property of the *railroad* company was sold, and bid in by the trustees for the benefit of the bondholers, the amount of the bid being paid in bonds secured by the mortgage. Nearly all of the bondholders assented to this arrangement, and under the laws of Alabama regulating the formation of such corporations, these purchasers formed a corporation known as the "Mobile and Montgomery *Railway* Company," to which, in November, 1874, pursuant to the order of the court, was delivered possession and control of all the property of the *railroad* company, including the premises in controversy.

The *railway* company was never disturbed in its possession by the holders of the Perry notes or other persons who, as it is averred, held liens on the property older than Per-

[Hall et al. v. Mobile & Montgomery Railway Co.]

ry's title. It is unnecessary, however, to go into detail as to the alleged defects in Perry's title, as it would seem from the testimony that the original purchaser from Perry (the *railroad* company) was fully informed as to the state of the title, and that matter was not deemed material in the present appeal. At the time the *railway* company took possession, property had greatly depreciated, and the real estate purchased of Perry was not worth the amount then due on the purchase money. The railway company made no payments on the principal or interest of this debt, but used the property and collected some rents, and was in such use and possession when the bill was filed. After the new company took possession, its *status* as to this property seems to have been the subject of some discussion among its officers, and for a time it was left to its president to determine what was best to be done about it. Afterwards, a committee of the directory examined the matter, and came to certain conclusions with reference to it, stated in a report, which is mentioned further on. Parties interested in the notes also had interviews with its president to induce him to pay the debt. On the 17th day of January, 1876, Hall made a formal written demand for the payment of the interest due on the notes held by him. The president of the *railway* company informed Hall's attorney that the matter would be referred to the legal adviser of the company.

In April, 1876, P. Hamilton, Esq., counsel for Hall, wrote to Tyler, president of the railway company, asking "if the company was any better prepared, than it was at former interviews, for the payment of the purchase money still unpaid upon the depot property," and asked to have certain reports furnished him, &c. To this Tyler replied, that he knew of no change in the position of the company, which he understood to be, that "as soon as the sellers of the property have cleared all previous liens, which they agreed to do, the railway company would carry out the contract, or give up the property without litigation." He also enclosed certain reports, extracts from which were given in evidence before the register. Some other letters passed between those gentlemen, in one of which Tyler made a proposition to have the property appraised and take it at its value, but nothing seems to have come of it. On the 6th of June, Mr. Hamilton proposed that the railway company pay certain taxes and the interest, and that the other matters be left for negotiation, and requesting reply, otherwise a foreclosure would be resorted to. The proposition was declined ; the president of the railway company, it seems, was of opinion that the payments and amounts expended by the old company and by

the new company, in improvements and repairs, would ex-
ceed interest or rent on the amount of the purchase money,
and that the property was not worth half of the amount the
*railroad* company agreed to pay for it.

Thereupon, on the 15th day of June, 1876, Hall, who was
owner of six of the notes, which had been transferred to him
by Perry, filed a bill against the other note-holders, and
against the Mobile and Montgomery *Railway* Company, and
also against the *railroad* company and others, praying, among
other things, not material to be here noticed, that a receiver
be appointed to take charge of the property, and to collect
the rents, incomes and profits of the property to become
due, and also "reasonable compensation of the railway com-
pany, for the use and occupation it has heretofore had of
said property." In the first stages of the cause a motion
was made for the appointment of a receiver, but action on
it was postponed from time to time, and on the 14th day of
July, 1877, the day on which the final decree was rendered,
another motion was made for the appointment of a receiver,
which also does not appear to have been acted on.

The answer of the railway company sets up certain defects
in Perry's title, denies any liability for the debt of the *rail-
road* company, or to pay interest thereon, or to pay for use
and occupation ; asserting that no proper demand for posses-
sion had ever been made, and that it had done nothing to
impair complainant's rights, but had simply remained in-
active, as it had the legal right to do. The answers of the
other defendants need not be stated, as they are immaterial
to the question here presented.

A reference was ordered, to ascertain the respective
amounts due the several note-holders, and certain other
matters not necessary to be here noticed; and a reference, on
motion of complainant, was also ordered before a special
master, to whom the other matters had been referred, to as-
certain and report the "value of the use and occupation of
the premises to the railway company since it has had pos-
session," and also the amount of rents collected. Among
other evidence submitted to the master, on these references,
were certain published reports of the officers of the *railway*
company made to its stockholders and directors.

In his report to the stockholders December 18th, 1874,
the president of the *railway* company, speaking of the pur-
chase, says :

"The recent sale of the Mobile and Montgomery Railroad,
and its purchase on account of the first mortgage bonds,
places the entire property and franchise in the hands of the
new company, which has been legally organized under the

laws of the State of Alabama, and named '*The Mobile and Montgomery Railway Company.*'

"In accordance with the conditions of the mortgage, the trustees had the right to buy in the property for and on account of *all the bondholders*, at a price not exceeding the amount, principal and interest, due on the bonds at the time of sale, as the chancellor, in his decree, instructed them so to do; and further, these bonds having been surrendered to the Register of the Chancery Court for cancellation, the Register should issue a certificate, entitling the holder to an undivided interest equal to 1-3022 of the whole property, subject to the following indebtedness, viz.": (Among other things) "Mortgage on Mobile real estate, $12,750, due in June, and balance, $80,000, due in November, 1876."

The decree under which the purchase was made was not offered in evidence, but it was agreed between counsel that the purchase was made by the trustees in the mortgage as hereinbefore stated. Nothing was there stated in this agreement about the liens to which the purchase was made subject. Tyler, in his testimony before the Register, speaking of the foreclosure, subject to the lien of certain bonds older than the one foreclosed, says:

In the president's report for the year 1875, under the head of a "statement of the condition of the railway company as shown by the general books of the company," there is included in the liabilities the following item: "Mortgage notes for real estate and depot property at Mobile, $92,750." In this same report, it is also stated, that "There are some legal matters connected with the depot property at Mobile, which renders it advisable not to pay the large balance, $92,750, due on that property, until certain mortgages, which *antedate* our titles, shall be removed, according to contract; but in the meantime, we are in possession and in use of the property, and do not anticipate any injury to our interests at present, or in the future. The board of directors understand this matter fully, and indorses the policy being pursued."

In a report made by the president to the board of directors, on the 23d day of March, 1876, he refers to the amount necessary to pay off the "debts against the company," except certain mortgages and bonds, "excluding, of course, the amount that will be due on the Mobile depot property, when we *agree* to take it." A committee of the directory, appointed by that body to examine into its affairs, reported to the directory on the same day, and used this language with reference to the property:

"We have also examined the company depot at Mobile, and

the adjacent property which the old company had contracted to buy, but which the new company are under no obligations to accept and pay for. The location is suitable, and it may be desirable that the company shall ultimately own this property, on which some payments have been made by the old company. But we find that real estate in Mobile is depressed in value, and we believe nothing will be lost by a "masterly inactivity"—awaiting as long as possible; this policy being also best adapted to the present means and ability of the company. At present, the sellers cannot make us a clear and perfect title to the property, there being some prior claims and entanglements. Meanwhile, the company is in possession, and its possession cannot be disturbed—probably not for one, two or three years, by which time, the indications are, that this property, or other equally suitable property, can be bought for a less sum than the balance the old company agreed to pay for the property in question—say $92,750. We believe that by the policy indicated, this or other convenient depot grounds may be eventually secured at about one-half that sum."

In a report made to the stockholders in December, 1876, speaking of the Mobile depot, the president says: "On referring to the financial statements, it will be seen that the debits for this property have been struck from the liabilities of the company."

The special master, after hearing the parties, reported the value of the use and occupation, and the amount of rents collected, and also his conclusion as to the liability of the railway company for use and occupation, in event it abandoned possession, the substance of his report being thus stated by the chancellor in his opinion on exceptions to the report by the railway company: * * * "The master found that the technical relation of landlord and tenant did not exist between the holders of the vendor's lien and the railway company, and the railway company was not liable for rents. In this conclusion the master was correct.

"But he found further, that the intention to repudiate the transaction, and to abandon the possession of said respondent [railway company] is shadowed forth by its answer; and he reports the moment such repudiation and abandonment becomes manifest, the railway company becomes liable to the note-holders for use and occupation of the lands—such use and occupation, however, not to exceed the interest due on said notes; and that when it elects so to repudiate and abandon, a reference should be ordered to ascertain the value of the use and occupation."

The court holding that "when the master found the rela-

tion of landlord and tenant did not exist between the note-holders and the railway company, all further inquiry as to the personal liability of the company is precluded, and that the only remedy of the note-holders was to sell under the power or file their bill for foreclosure, and apply in time for a receiver to intercept rents and profits *pendente lite*," and thus prevent their going into the hands of the party in possession,—sustained the exceptions to that part of the special master's report as to the liability of the railway company in event of abandonment.

Sustaining this exception to the master's report, is now assigned as error.

P. HAMILTON, for appellant.—The railway company has never paid a cent for this property. It has used it for years without being disturbed, and refuses to pay interest. At first it treated the purchase-money as a debt, reported it among its liabilities, and held on to the property, succeeding to rights acquired by the purchase made of Perry. Latterly, it congratulates itself on possession; denies any liability to any party by reason of that possession; asserts that its possession can not be disturbed for two or three years, and that it can only come under liability by reason of its voluntary acceptance of the purchase, and this, at its pleasure; and till such acceptance, which it proposes to postpone as long as possible, it intends to use its possession to force the holders of the debt for purchase-money to sell it, the property, "at about half the balance now due." These facts give a plain equity to the vendor, or those standing in his place, that the vendee, and those who succeed to his rights and continued in quiet enjoyment of the property, shall either comply with the terms of the sale, or promptly decline to accept, and return the possession to the vendor or his assignee; or, failing in this, make up to the latter the fair value of the use and occupation which those succeeding the vendee have enjoyed.

II. The title in this case was in the vendee, no right of re-entry was reserved by the vendor, and he had no right of possession, and could not maintain ejectment, or other legal action, to recover possession or rents. The right which remained in Perry and his assignees, is an *equity* that the lands in possession of the *railroad*, and those holding its title, shall be applied to the payment of the purchase-money before any beneficial interest shall be claimed by the vendee. The vendor's right is to a lien on the land, the legal title in the vendee. In case of a mortgage, at least after the law day, the legal right is with the creditor, the equity with the debtor;

[Hall et al. v. Mobile & Montgomery Railway Co.]

here the equity is with the creditor, the legal right with the debtor. In this case, the debtor, and those standing in his shoes, acquired the legal title, clothed with an equity in favor of the creditor, *as to the use and occupation of the property.*

III. The *railway* company is the mere assignee of the original purchaser, not standing as a *bona fide* purchaser for value without notice. The case shows the relation of vendor and vendee, and the transaction between Perry and the railroad company gives him an "equitable" mortgage. In this case, the equity is distinctly recognized by the declarations of the parties, and does not rest alone on mere legal inference from the facts. Mr. Washburn (Real Prop., vol. 2, 86, 3d edition) says, "the right in such case, which equity raises by way of lien in favor of the vendor for payment of the purchase-money, rests upon the ground that the purchaser *is trustee* of the premises for the vendor till the purchase-money is paid. If I convey land to you and take no collateral security for the payment of the purchase-money, you become *a trustee* for me till the purchase-money is paid." " To the extent of the lien, the vendee becomes *trustee for the vendor*." Perry on Trust, § 232 ; 43 Miss. 570 ; 42 Miss. 18. It is clear, therefore, that the railway company, the assignee with notice of complainant's rights, holds this property in *trust* for Perry's assignees. A trust is fastened on the land the *corpus*, and wherein do the profits of the land differ from the land? The legal title and right of possession being in the vendee, how then could complainant assert at law or equity right to the *possession ?* Complainant's remedy was in equity, to charge the *trustee* with the value of the rents and profits, or if the trustee used and occupied, then with the value of such use and occupation. Complainant could not recover rent or possession.—52 Ala. 258. The property here was ample for the payment of the interest, and until the notes matured, the complainant could not have obtained a receiver, there being no waste, &c.—*Hughes v. Hatchett*, in MSS.

IV. The railway company succeeded to rights of the railroad company which was under personal liability for the debt to the vendor, and the railway company comes under liabilities to it, at least in equity. There arose an equity, in favor of the railroad company when the railway company took possession, that the latter should perform for the assignor what it had undertaken to do for its vendors, and which the railroad company could no longer perform by reason of the transfer. The notion of a right in this railway company to enjoy this property at the expense of its assignor, or at the expense of the vendor, and without liability of any kind to any person, finds no countenance in any theory of

equity which can be advanced. "If he (the assignor) enter into no obligation with the party from whom he purchases, neither by bond, nor covenant of indemnity to save him harmless from the mortgage, yet this court, if he receives possession, and has the profits, could, independent of contract, *raise upon his conscience an obligation to indemnify the vendor against the personal obligation to pay the money due upon the vendor's transaction of mortgage;* for having become owner of the estate, he *must be supposed to intend to indemnify the vendor against the mortgage.*"—*Waring v. Ward*, 7 Vesey, jr., Rep., 437; *Elliott v. Edwards*, 3 Bos. & Pul. 181, 183; 15 Vesey, jr., 340, 347. Whatever equities the railroad company could enforce against the railway company, with regard to this debt, and which grow out of the contract made for its security, complainant can enforce in equity.

V. The conduct of the railway company shows that it has long since elected to take the property, under the terms under which the railroad company held it. It has had long possession, and not with the view of ascertaining the facts; for it had full knowledge of them. Its purpose in holding possession, was the unconscionable one of getting something for nothing; standing ready to repudiate the contract of sale, all the benefits of which it enjoyed, whenever it was called on to pay. Its right on purchasing the property of the railroad company, was promptly to elect whether to take the property. If it did not intend to take the property, it should have restored it, and not doing this, it is accountable, *so long as it remained in possession*, for the reasonable value of the use and occupation. It can not take all the benefits of the contract and repudiate all its burdens.—2 Kent Com. 74. The railway company can not be permitted to speculate on the rights of complainant.—Perry on Trusts, § 259; Hill on Trustees, 219. The reason of this rule is not confined to technical trusts.—Perry on Trusts, § 259.

R. Inge & G. L. Smith, *contra.*—The possession of the railway company was *lawful*, and its enjoyment of rents and occupation of the property was lawful. These were but the exercise of *legal* rights, and there was nothing inequitable in it; "for the mortgagor ought to take steps to get into possession" (3 Atk. 44), and if he fails to do so, he can not complain that another exercises his legal rights. His own *laches* alone prevented putting a stop to rights, the assertion of which is now assailed as inequitable and unconscionable.

II. Perry, and his assignees, can certainly stand in no better position than mortgagees. A mortgagee is not entitled to rent or compensation, until a receiver is appointed, or at

least until he has demanded possession, and notified the tenant, or sub-purchaser, to pay him rent.—Hilliard on Mortgages, ch. viii; Thomas on Mortgages, p. 301; 9 Ala. 636; 4 Ala. 486; 10 Paige, 47; 33 Ala. 773; Jones on Mortgages, 517.

III. But what was the nature of Perry's rights, and those of his assignees? He expressly reserved a lien for the purchase-money on the face of the deed. It was "an *express* lien by contract," inconsistent with a "vendor's lien," which is an *implied* trust. The taking of a power of sale, in connection with an express reservation, in the deed, of a lien for the purchase-money, only makes the stronger case of a mortgage with a power of sale.—1 Jones on Mortgages, § 229. "It is equal to a mortgage taken contemporaneously with the deed, and nothing more." By Perry's contract was made an agreement which required some action of a court *to declare it a mortgage.* This contract was not the result of fraud or mistake, but adopted from deliberate choice. The necessities of complainant require that he should have the court enforce his contract as a mortgage. Does this give the court the right to add something not contracted for—a trust to account for past use and enjoyment, under an express conveyance and livery of seizin? Perry did not intend to take or hold the legal title, and without this legal title rents can not be collected until after demand made. The "*trust*," which complainant seeks to have enforced, is express, and all implied trusts are cut off. ·

IV. Here the railway company went into possession under a conveyance to the old road, and none of the parties are disaffirming the contract.—Code, § 2956. That section of the Code covers the whole of the common law on that subject, and to the extent of conflict repeals it. Perry retained neither a *jus ad rem*, nor a *jus in re*. He had no title or right of possession, after his conveyance. His contract, far from raising an implied tenancy, repels it.—*Tucker v. Adams*, 52 Ala. 258; *Shumate v. Nelms*, 25 Ala. 134. To recover for use and occupation, the relation of landlord and tenant must subsist by an agreement express or implied.—52 Ala. 254; 19 Ga. 313; 11 Pick. 1; 26 Miss. 94; 15 Ill. 61; 2 Hill, 540. It is claimed that *Davidson v. Earnest* (7 Ala. 819), and *Smith v. Wooding* (20 Ala. 327), are opposed to this view. In both of these cases, there was an implied promise to pay rent. Here there was a purchase and sale, and this complainant affirms by his bill, and yet he asks relief which could be granted only on rescinding the sale, and treating the railway company as a tenant! A court of equity has no more power

[Hall et al. v. Mobile & Montgomery Railway Co.]

than a court of law, to decree for use and occupation, in defiance of the statute.

VI. If the complainant had a "vendor's lien," he would not be entitled to back rents, or to recover for use and occupation, prior to demanding possession, and enforcing his rights by legal remedies.—*Little v. Brown*, 2 Leigh. 35; 3 Iredell Chancery, 311; 5 Humphries, 387. He might, in a proper case, intercept rents accruing *after* the appointment of a receiver. Until he does this, he can not complain that the vendee occupies and uses the property and receives rents. If complainant was entitled to a receiver, he should have pressed his motion. Not doing so was a *waiver* of his right to recover for back rents and use and occupation, even if he had that right, if he had promptly resorted to his remedies. The railway company is a purchaser for value, as much so as if the amount bid for the property had been paid in cash, instead of bonds.

MANNING, J.—This cause is brought before us upon a cross-appeal. It was here before upon a contention different from the one now raised. The question is, whether or not the Mobile & Montgomery Rail*way* Company, purchaser of the property of the Mobile & Montgomery Rail*road* Company, is bound in equity to pay rent for the real estate in controversy, during the time it had the possession and use thereof, to the holders of the unpaid notes executed for the purchase-money, by the railroad company, to Mr. Perry. Counsel for appellants, the holders of these notes, insist that the railway company is liable for such rents, not exceeding the interest that annually accrued upon the notes. A restatement of some of the facts, will aid us in the solution of the question.

When Mr. Perry conveyed the real estate, lately constituting the depot and its appurtenances, in Mobile, of the Mobile and Montgomery Railroad Company, to that corporation, he expressly reserved in the deed what was called therein "a vendor's lien" upon the property, to secure the payment of the notes given for the price; and he took back from the company its irrevocable letter of attorney, authorizing Perry, or the transferrees to whom he should negotiate the notes, to sell, from time to time, so much of this property as should be necessary to pay them. The title he conveyed to the company was not conveyed back to him by a mortgage in regular form. But he was clothed with a power to sell it as an attorney in fact of the company, and in its name, for the purpose of paying the notes.

Now, what was the nature of the interest in the real estate

in question, that this transaction created in Perry? If it made him, in effect, a mortgagee, and the possessory right of the company was substantially that of a mortgagor, counsel for appellant concede, as we understand, that the company, or the purchaser from it, would not be accountable for the rents until possession of the property was taken, or at least demanded by the mortgagee. But it is contended that Perry had only a vendor's equitable lien, and therefore, the rule in relation to mortgaged property, was not applicable. Whether a different rule would be applicable, if that were so, we need not inquire. It appears to us that by the provisions of his sale, Perry acquired an equitable mortgage.

In the new and valuable work of Jones on Mortgages, it is said: "There are as many kinds of equitable mortgages, as there are varieties of ways in which parties may contract for security, by pledging some interest in lands. Whatever the form of the contract may be, if it is intended thereby to create a security, it is an equitable mortgage;" that is, of course, if it is not a legal mortgage.—§ 162.

And again he says, upon the authority of adjudged cases: "An express reservation, in a deed, of a lien upon the land conveyed, creates an equitable mortgage; and when the deed is recorded, every one is bound to take notice of the incumbrance. Thus, where land was sold, and for the purchase-money several promissory notes of the purchaser were taken, and these were described in the deed of conveyance and expressly made a lien upon the lands conveyed, a purchaser on execution obtained only on equity of redemption subject to such lien.—Id. § 228.

And in regard to the difference between a vendor's equitable lien and an equitable mortgage, the same author says: "A lien for the purchase-money expressly reserved by the vendor in his deed of conveyance, is a lien created by *contract not by implication of law.* It is a contract that the land shall be burdened with a lien until the note is paid. It is really a mortgage. The lien then becomes a matter of record when the deed is recorded. It is not waived by the taking of other security, as is the case with an ordinary vendor's lien. *It is governed by the same rules that a mortgage is.* It passes by an assignment of the note secured by it. It is foreclosed as a mortgage; and there is the same right of redemption for a limited period after the foreclosure sale."— § 229.

And of a like lien reserved in a deed of conveyance, Justice BRADLEY of the Supreme Court of the United States, says, it "is equal to a mortgage," and "the purchaser has the equity of redemption, precisely as if he had received a deed

and given a mortgage for the purchase-money."—*King v. Young Men's Association* ; 1 Woods, 386.

These passages are directly applicable to the deed executed by Perry, which is under consideration in this case. The notes for the purchase-money are particularly described in it, and a vendor's lien to secure payment of them, is expressly reserved. The security thus provided by the contract of the parties, is an equitable mortgage. And it is the first case which has come under our observation, of an equitable mortgage, to which a *power of sale* was annexed. This power is conferred by the letter of attorney executed by the company to Perry ; and it was intended to pass and be available to the transferrees, respectively, of the several notes. But owing to the number of them, and the variety and opposition of their interests, if not also to other difficulties, the exercise of this power became so embarrassed, that the aid of a court of equity was properly invoked, to obtain a sale under its direction.

In this suit, therefore, Mr. Hall and the other holders of the notes stand as mortgagees. The assignment of the notes, carried to them the security, provided for their payment. The Mobile & Montgomery Railway Company, purchaser of the rights and interests of the Mobile & Montgomery Railroad Company, acquired the mortgagor's equity of redemption. And because the property in question, which is subject to some older incumbrances, is not of sufficient value to pay the notes—those mortgagees, appellants in this cause, claim rents of the railway company, at least to an amount not exceeding the annual interest on the notes.

But why should the railway company's obligation depend upon, or to any extent be regulated by the interest that accrued on these notes ? With the mortgagor's notes or the interest due upon them, one who purchases his equity of redemption in the mortgaged property, without any stipulation on his part to pay them, need have nothing whatever to do. They are not the measure of any liability which the law casts upon him; for he does not by his purchase become personally liable for the mortgage-debt. He may give up the property at any time in satisfaction of the lien.—Jones on Mort. § 738, and cases referred to.

Even if the purchaser of an equity of redemption take a deed of it, which expressly declares it to be conveyed subject to a specified mortgage, he does not thereby become liable for the mortgage-debt. To create such a liability, there must be words which clearly import that the grantee assumed the obligation of paying the debt.—§ 748, and cases cited. But there is nothing in the transfer in this case, from

the railroad company to the railway company, which obliges the latter to pay any debt of the former company to anybody.

The learned counsel for appellant, Hall, spoke of the railway company, as if it were a mere voluntary grantee of the property, almost as an intruder without any right, legal or equitable. In this he was incorrect. That company was composed of the holders of the bonds of the railroad company. It owed them money to a very large amount. And being unable to obtain payment, they purchased with these bonds all its railroad property and rights of property under the mortgage made to secure payment of them. Between the two companies, at least, there was an ample and valuable consideration. And the railway company acquired all the property and rights, to their fullest extent, of the railroad company, without, as we have seen, becoming responsible for its debts.

What were its rights in respect to the rents in question? So long as a mortgagor is allowed to remain in possession, he is entitled to receive and apply to his own use the income and profits of the mortgaged estate. He is not liable for rent. Nothing in the law of mortgages is better settled than this. Although the mortgagee may have the right to take possession upon a breach of the condition, if he does not exercise this right he cannot claim the property. And this is true of a railroad as well as of any other property. If the mortgagees want it, they must take possession of the property, or pending a bill to foreclose the mortgage, apply for the appointment of a receiver. And even a receiver, when appointed, cannot recover income then in the hands of an agent of the mortgagor, which accrued before the receiver was appointed.—*Noyes v. Rich*, 52 Maine, 115. See, also *Railroad Company v. Cowdrey*, 11 Wallace, 481.

Appellant's counsel has very forcibly and earnestly presented his views of the abstract rights of the parties to this cause. We cannot adopt those views and apply them as rules of law, without departing from some of the best established principles in the law of mortgages, and attempting to navigate narrow seas without regard to the charts made after numerous and careful explorations, by which our course should be guided.

In respect to the extracts from the reports of the President of The Mobile & Montgomery Railway Company, to the stockholders, and from the accounts of the corporation: they certainly show that it was supposed, by some of the company's officers, that it was its duty or interest to pay the notes executed to Perry. But these extracts relate to mat-

[McDowell, Adm'r, v. Jones, Adm'r.]

ters and things done within the corporation, and in respect to which the members might well express their views, and the corporation retain a record of them, without contracting thereby liabilities to third persons. And a corporation, like an individual, may change its purposes, without violating any legal duty to others. Counsel for appellants did not himself think that the proceedings referred to amounted to an assumption of the railroad company's debt to his clients, and therefore, did not claim that it was bound to pay the principal of that debt; yet the extracts they have produced refer as much to the principal as to the interest. The latter is as much a part of the company's debt as the former, and as distinct an assumption of it as of the principal, would be necessary to make the railway company personally liable for it.

The chancellor committed no error in the particulars indicated by the assignment of error, and his decree must be affirmed.