120 So.2d 733

**S. Tyre RUSSELL**

v.

**Ruth RUSSELL et al.**

**3 Div. 875.**

Supreme Court of Alabama.

March 24, 1960.

Rehearing Denied June 2, 1960.

L. H. Walden, Montgomery, and John C. Walters, Troy, for appellant.

Scott, Whitesell & Scott, Montgomery, for appellee.

Godbold, Hobbs & Copeland, Montgomery, for intervenor.

MERRILL, Justice.

Appellee, Ruth Russell, filed a bill against appellant for divorce and alimony on the ground of adultery with divers persons unknown, and with Margaret Schofield in particular. The bill also asked that appellant be restrained from interfering with or molesting complainant, or from disposing of any property that he owned at the time of the filing of the bill. The restraining order was granted and, after an answer was filed, Peoples Bank and Trust Company filed a petition for intervention, which was granted.

After a hearing, Judge Walter Jones granted the divorce on the ground of adultery; granted certain alimony in gross, consisting of the house where complainant lived and the furnishings therein; ordered that appellant pay $50.00 per month as alimony and allowed an attorney's fee of $800.00.

In the decree on the petition for intervention, Peoples Bank was granted an equita-

ble mortgage lien on some five hundred acres of appellant's unencumbered land to secure a debt of $25,000, which he owed the bank.

### The Divorce Phase

The Russells were married in 1926. They had one son, who is now over twenty-one years of age.

Mrs. Russell testified that about eleven years ago, a son was born to Margaret Schofield in Crestview, Florida. His name was Rickey. Mr. Russell told his wife that Rickey was his child and asked her to take the boy into their home and raise him. This was the first time Mrs. Russell knew of Margaret Schofield. Mrs. Russell took the child to raise, with the understanding that Russell "was to change and quit running around." Rickey was three days old when she took him.

A year later, Margaret Schofield had another child, a daughter. Russell brought this child to his home. After two weeks, Mrs. Russell separated from her husband and they stayed separated for nine months. Russell took the child back to Margaret Schofield's parents and again asked his wife to forgive him. She did and they began to live together again.

Mrs. Russell later heard that Margaret Schofield had a third child, but Russell said this child was not his.

Margaret Schofield married, moved to North Carolina and died, and the two younger children lived with her parents until July, 1958, when her mother, the children's grandmother, died. Russell then told his wife that he had two orphan children on his hands and that she was going to have to take care of Margaret Schofield's two youngest children. She told him that she would not take the children and he left their home and moved to another house which he owned on Edgemont, and since that time, Russell has lived in that house with Margaret Schofield's three children.

After the separation, Russell came back to complainant's home on East Patton and told Mrs. Russell that he could not understand why she could love Rickey as she did and not love the other two children "because they were all the same flesh and blood." This was the first knowledge Mrs. Russell had that Russell was the father of the third child. Mrs. Russell never lived with her husband after she learned that he was the father of the third child.

On subsequent occasions, he came by the house on Patton and had sexual intercourse with her. She said she submitted to him on the agreement that he would let Rickey come over and see her. He did permit Rickey to come to see her after each of these occasions. She testified that she found an obituary notice of Margaret Schofield's death among Russell's papers and it showed among her survivors a son, James Russell.

Russell testified that he had never had intercourse with Margaret Schofield and was not the father of her children, but that he just loved children and was helping take care of them, and he denied ever discussing the paternity of the children with his wife.

Appellant insists that the court erred, first, in holding that the evidence supported a divorce on the ground of adultery, and second, that even if he had been guilty of adultery, the wife had condoned it.

■ Appellant argues that the evidence of adultery is based upon the alleged confession of appellant, which was not admissible under Tit. 34, § 26, Code 1940, which states in part: "No decree can be rendered on the confession of the parties, or either of them." Under an early statute, such confessions were wholly inadmissible, King v. King, 28 Ala. 315, but in Dawson v. Dawson, 240 Ala. 258, 198 So. 622, 623, it was said in reference to the present statute: "Extra judicial confessions in a litigated case are now admissible, but must be corroborated by other proof. Luns-

ford v. Lunsford, 232 Ala. 368, 168 So. 188." The evidence of Russell's purported admission was admissible.

■ We come now to the question of the sufficiency of the evidence to support the divorce decree. In Stephens v. Stephens, 233 Ala. 178, 170 So. 767, it was said that adultery, being an act of darkness and of great secrecy, can hardly be proved by direct means; that presumptive evidence alone is sufficient proof; and the only general rule that can be laid down is, that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion of guilt. This rule is followed in Dawson v. Dawson, 240 Ala. 258, 198 So. 622; Gardner v. Gardner, 248 Ala. 508, 28 So.2d 559; Rudicell v. Rudicell, 262 Ala. 41, 77 So.2d 339.

The confession of appellant that Margaret Schofield's third child was his was corroborated by evidence that she had already borne two of his children; that he had supported her and the two children by buying food, clothing and providing medical attention for them, both while they lived on his farm and elsewhere; that the third child bore his name; that he had petitioned the Juvenile Court of Lowndes County for the custody of the third child and that he subsequently took the child into his home to raise.

■ It is evident that the trial court did not give much credence to appellant's denial of paternity to any of the three children. Appellant argues in brief that "the rule on ore tenus is somewhat different on a divorce case than a regular case." With this, we cannot agree. The rule is that where the testimony was taken ore tenue before the trial court, its findings of fact are to be accorded by this court an authority equal to that of a jury. Rudicell v. Rudicell, 262 Ala. 41, 77 So.2d 339; White v. White, 246 Ala. 507, 21 So.2d 436; Stephens v. Stephens, 233 Ala. 178, 170 So. 767; Le May v. Le May, 205 Ala. 694, 89 So. 49.

■ We conclude that there was evidence which, if believed, supported the decree.

■ Appellant argues that even if adultery were proved, there was a complete condonation on the part of appellee. This argument would be sound as to the two older children. But the divorce proceeding did not start until after appellant had told appellee that all three children were the same flesh and blood and the younger two were his responsibility.

But appellant contends that the admitted acts of sexual intercourse that occurred between the time of the separation and the filing of the bill for divorce amounted to condonation. In Cox v. Cox, 267 Ala. 72, 100 So.2d 35, 36, we said:

"The separation took place on January 12, 1957. This suit was filed May 23, 1957. Twice during this period appellee submitted to intercourse with appellant. There was never any intention on the part of the appellee to forgive the appellant or to resume cohabitation with him. In Brown v. Brown, 219 Ala. 104, 121 So. 386, 387, this court defined condonation as 'the willing continuance of cohabitation, a living together in the same place.' See also Harbin v. Harbin, 249 Ala. 616, 32 So.2d 537. Here proof of two acts of intercourse during the separation of the parties does not necessarily establish condonation, where there is no intention to forgive and to resume marital relations. See Annotations 32 A. L.R.2d 141; Campbell v. Campbell, 246 Ala. 107, 19 So.2d 354, 155 A.L.R. 130."

In the last cited case, where the ground for divorce was voluntary abandonment, it was stated that the "authorities appear to be in conflict," [246 Ala. 107, 19 So.2d 355] but after a citation of authorities, it was held:

"In the instant case, as stated above, we are fully convinced by the evidence that at the time the wife submitted to

the embraces of the husband she had no intention to restore the marital relation."

It is clear that appellee here had no intention to restore the marital relation when she submitted to the embraces of her husband after their separation. We cannot say that the court erred in not finding that the adultery had been condoned.

There was no reversible error in the proceedings which culminated in the granting of the divorce.

### The Intervention Phase

Peoples Bank loaned Russell $25,000 in August, 1957, due in one year with interest added to the note. As collateral, Russell assigned three insurance policies, having a cash surrender value of $4,500, and J. L. Crenshaw guaranteed payment of the note. When the note came due, Russell paid only the interest. A new note was made with the same insurance policies as collateral and a new guarantee by Crenshaw.

When the second note came due, Russell paid neither principal nor interest but requested a renewal. The bank's investment committee approved a six months' extension, provided he would give as additional collateral a mortgage on his Montgomery County farm land. He agreed to give the mortgage and was directed to deliver his abstracts to the bank's attorney. The renewal was not delayed to await examination of abstracts and the execution of the mortgage because bank examiners were at the bank and both the bank and Russell desired to get the loan out of the defaulted status.

A few days later, Russell's wife sued him for the divorce and asked for a division of his property. The bank asked Russell to carry out his agreement to execute the mortgage even though his wife did not sign it, but he refused, and the bank filed their petition for intervention, asking for an equitable lien on his farm lands.

Appellant makes three contentions as to why an equitable mortgage or lien should not have been declared: The first is that "the essence of equitable mortgage is to secure the advancement of money with which to purchase [lands]." If this were a correct statement of the law, then there could be no equitable mortgage in the instant case. But our cases hold otherwise. In Roberts v. Lindsey, 242 Ala. 522, 7 So. 2d 82, this court held that a contract which provided that if the builder would erect a filling station on the owner's land, the builder would have a lien on the property until he was paid, created an equitable lien which was subject to foreclosure. In Murphy v. Carrigan, Ala., 116 So.2d 568, we held that a builder who had been promised a mortgage for moving and repairing a house was entitled to an equitable mortgage.

In Bishop v. McPherson, 232 Ala. 594, 168 So. 675, 678, it was said that the following quotation from 41 C.J., § 33, p. 293; 59 C.J.S. Mortgages § 13, finds abundant support in our own adjudications:

> " 'Courts of equity are not governed by the same principles as courts of law in determining whether a mortgage has been created, and, generally whenever a transaction resolves itself into a security, or an offer or attempt to pledge land as security for a debt or liability, equity will treat it as a mortgage, without regard to the form it may assume. Although the conveyance in question may lack the formal requisites of a mortgage, or be expressed in inapt or untechnical language, equity will look to substance and give effect to the intention of the parties.' "

In Woodruff v. Adair, 131 Ala. 530, 32 So. 515, 519, it is stated:

> " * * * 'There are many kinds of equitable mortgages, as there are variety of ways in which parties may contract for security by pledging some in-

terest in lands. Whatever the form of the contract may be, if it is intended thereby to create a security, it is an equitable mortgage, that is, of course, if it is not a legal mortgage.' Hall v. Mobile & M. R. Co., 58 Ala. 10, 22. * * *"

In Murphy v. Carrigan, ante, p. 87, 116 So.2d 568, 571, we said:

"In order for an equitable mortgage to exist, it is essential that the mortgagor have a mortgageable interest in the property sought to be charged as security; that there be clear proof of the sum which it was to secure; that there be a definite debt, obligation or liability to be secured, due from the mortgagor to the mortgagee; and the intent of the parties to create a mortgage, lien or charge on property sufficiently described or identified to secure an obligation. Barnett v. Waddell, 248 Ala. 189, 27 So.2d 1; Pollak v. Millsap, 219 Ala. 273, 122 So. 16, 65 A.L.R. 110; Jones v. Stollenwerck, 218 Ala. 637, 119 So. 844; 59 C.J.S. Mortgages §§ 13 and 15. All of these elements are present in the averments of the cross-bill."

■ All of these elements exist in the instant case. We, therefore, hold that this was a proper case for the application of an equitable mortgage.

Appellant's second contention is that the renewal or extension of the debt by the bank in reliance on appellant's promise to execute a mortgage on his farm lands was not sufficient consideration to support an equitable mortgage. We cannot agree.

■ In Roberts v. Lindsey, 242 Ala. 522, 7 So.2d 82, 84, we said:

"A test of good consideration for a contract is whether the promisee at the instance of the promisor has done, forborne or undertaken to do anything real, or whether he has suffered any detriment, or whether in return for the promise he has done something he was not bound to do, or has promised to do some act or to abstain from doing something. Presbyterian Board of Foreign Missions v. Smith, 209 Pa. 361, 58 A. 689. That the instant contract meets that test is obvious beyond the necessity of elaboration."

In 59 C.J.S. Mortgages § 92, it is said:

"The forbearance of a creditor to sue on a debt or claim or his extension of time for payment of the debt or interest thereon may constitute a sufficient consideration for a mortgage."

Some of our cases so holding are Hartford Fire Ins. Co. v. Clark, 258 Ala. 141, 61 So. 2d 19; Moore v. First National Bank, 139 Ala. 595, 36 So. 777; Starr Piano Co. v. Baker, 8 Ala.App. 449, 62 So. 549. Cases from other jurisdictions specifically holding that the granting of an extension of time to pay an indebtedness is sufficient consideration to support the giving of additional security for a pre-existing debt are: Panama Savings Bank v. Arkfeld, 228 Iowa 313, 291 N.W. 182; Hawe v. Johnson, 130 Neb. 320, 264 N.W. 760; Havel v. Havel, 145 Kan. 650, 66 P.2d 399; Hahn v. Hahn, 123 Cal.App.2d 97, 266 P.2d 519; Portland Cattle Loan Co. v. Hansen Livestock & Feeding Co., 43 Idaho 343, 251 P. 1051; Dempsey v. McKenna, 18 App.Div. 200, 45 N.Y.S. 973.

■ Appellant's third contention is that the evidence does not support the establishment of an equitable mortgage. Not only do we regard the evidence sufficient, and it supported the statement of facts in this phase of the case, but appellant did not help his cause when he testified that he did not know the value of his farm land; his own telephone number; how many rooms are in the house he lives in; what his net worth was; how much land he was leasing; how many cattle he owned; how many eggs he was getting on his chicken farm; how much of his land is open land; how many cattle he sold in

1958; whether his chicken farm is on his own land or leased land; whether he owns a controlling interest in a corporation of which he is the president; who his landlord is; the value of improvements on his land; the value of his own house, or how much equity he has in it; whether he owned a tractor or whether he owned a truck; or his monthly or yearly income.

Lastly, appellant argues that the court erred in allowing the intervenor a solicitor's fee. Appellant's note, which was in evidence, provided for "all costs of collecting or securing or attempting to collect or secure this note, including a reasonable attorney's fee." Evidence of a reasonable attorney's fee was before the court, and such a stipulation in the note has been held to include an attorney's fee in a suit in equity to enforce a vendor's lien on the land, Johnson v. Durner, 88 Ala. 580, 7 So. 245, and no error was committed in the allowance of same.

The decree of the trial court on the petition for intervention is affirmed.

### Attorneys' Fees

Attorneys for Ruth Russell were allowed $800 as fees by the trial court. They have petitioned for allowance of fees on this appeal. The petition is granted in the sum of $270. Windham v. Windham, 234 Ala. 309, 174 So. 500; Ex parte Taylor, 251 Ala. 387, 37 So.2d 656; Sims v. Sims, 253 Ala. 307, 45 So.2d 25, 15 A.L.R.2d 1246.

Attorneys for the intervenor were allowed $1,500 as fees by the trial court. They have petitioned for allowance of fees on this appeal. The cases cited are not apt authority and the petition is denied.

Affirmed.

LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.