21 So.3d 1196 (2008)
SOUTHLAND BANK and Jimmy Adkinson
v.
A & A DRYWALL SUPPLY COMPANY, INC., and Chadwick E. Anderson.
1060204.
Supreme Court of Alabama.
December 12, 2008.
Opinion Overruling Rehearing April 24, 2009.
*1199 William P. Gray, Jr., and Douglas N. Robertson of Gray & Associates, L.L.C., Birmingham, for appellants.
Ted Taylor, Leah O. Taylor, and Rhonda Pitts Chambers of Taylor & Taylor, Birmingham; and William L. Lee IV and William L. Lee III of Lee & McInish, P.C., Dothan, for appellees.
Forrest S. Latta and Leronne Riddick-Seals of Bowron, Latta & Wasden, P.C., Mobile; and R. Bruce Barze, Jr., of Balch & Bingham, LLP, Birmingham, for amicus curiae Alabama Defense Lawyers Association, in support of the appellants.
H. Hampton Boles, Gregory C. Cook, and John D. Pickering of Balch & Bingham, LLP, Birmingham, for amicus curiae Alabama Bankers Association, in support of the appellants.
James Jerry Wood, gen. counsel, Home Builders Association of Alabama, Montgomery, for amicus curiae Home Builders Association of Alabama, in support of the appellees.
Leila H. Watson of Cory, Watson, Crowder & DeGaris, P.C., Birmingham, for amicus curiae Alabama Association for Justice, in support of the appellees.
Joe C. Cassady of Cassady & Cassady, LLP, Enterprise, for amicus curiae AMAROK, Inc., Drywall Distributor Cooperative, in support of the appellees.
SMITH, Justice.
Southland Bank and Jimmy Adkinson, defendants below, appeal the trial court's judgment on a jury verdict in favor of the plaintiffs, A & A Drywall Supply Company, Inc. ("A & A"), and Chadwick E. Anderson. We reverse the trial court's judgment and render a judgment for Southland Bank and Adkinson.

Facts and Procedural History
Anderson was the president and sole shareholder of A & A. The company sold drywall and roofing and ceiling products to contractors and the general public. Anderson started the company in 1996 after having worked for his father, Glenn Anderson, who had also owned a drywall business. Although business increased in 1999 and 2000, A & A struggled financially at times. In its best year, 2000, A & A made a profit of $52,000, which represented 1.64% of A & A's total sales. It started 2001 with $480,000 in accounts receivable and $500,000 in accounts payable.
From time to time A & A contracted to supply projects with the United States Department *1200 of Housing & Urban Development ("HUD"). Certain payment procedures with these projects often created cash-flow problems for A & A. In 2001, A & A was presented with the opportunity to bid on larger HUD projects. These projects required more than twice the volume of materials A & A normally kept in inventory and thus required more capital.
Anderson considered opening new supply facilities for A & A in various locations to support the anticipated increase in business from the HUD projects. Anderson decided to seek a $500,000 line of credit to pay off a portion of A & A's existing debt and to increase the company's working capital for the purchase of more inventory.
Anderson first met with Waylon Fulford, a loan officer with SouthTrust Bank, regarding a line of credit. Fulford had previously worked with A & A in financing certain equipment purchases. Anderson submitted to SouthTrust a request for a loan along with other documentation. Fulford asked Anderson to submit certain financial information about A & A and a letter requesting a line of credit.
At this time, Anderson also learned of a loan-guarantee program offered by the United States Small Business Administration ("SBA"). The SBA offered a program referred to as the "7(a) Loan Guaranty Program," which guaranteed certain loans extended by lenders to qualified small businesses. To obtain such a guarantee, an application was made with the SBA. After considering the application, which could be complex and include numerous documents, the SBA could guarantee as much as 75 to 85 percent of a loan issued by a lender to a small business.
While waiting on SouthTrust to approve his request for a line of credit, Anderson went to see Jimmy Adkinson at Southland Bank. Adkinson was a senior vice president of Southland Bank and a "long time friend" of Anderson. Both Anderson and his father, Glenn, had banked with banks at which Adkinson had worked for many years. In fact, Adkinson had worked for various different banks over the years, and Anderson would transfer his accounts to follow Adkinson when Adkinson changed employers.
Anderson said that he wanted to discuss "the SBA" with Adkinson because he "trusted [Adkinson's] judgment." Additionally, Anderson wanted to ask Adkinson if he believed that SouthTrust Bank was taking an inordinately long time to approve the line of credit. Anderson asked Adkinson to look at the materials he had submitted to SouthTrust. Anderson testified regarding this conversation as follows:
"I think, basically, I just asked him, `Jimmy, is this loan something y'all are interested in.' And he said, `Yeah.' And I said, `Well, now if the SBA approves it, are you going to write the loan.' And he said, `I can't see any reason why we wouldn't.'"
According to Anderson, Adkinson stated that he had the necessary application forms for the SBA loan guarantee program but recommended that Anderson have Cindy Watt[1] professionally prepare the necessary application and supporting paperwork. A & A hired Watt and paid her $1,000 for the work on an application for an SBA guarantee; Anderson and Watt worked together to complete the application. Anderson also forwarded Adkinson a letter requesting a loan, as well as certain financial information. Anderson *1201 testified that later Adkinson indicated to him that "Southland Bank would do a loan if the SBA guaranteed it." Adkinson, on the other hand, denied telling Anderson that the loan would be approved by Southland Bank if the SBA guaranteed it.
On March 13, 2001, Adkinson executed several documents to be submitted to the SBA with Anderson's application, including a form entitled "Lender's Application for Guaranty or Participation" ("the SBA application"). This document states that Southland Bank and A & A "propose" to enter into a guaranteed loan. Additionally, a "credit analysis" prepared by Watt was included with the application; it stated that "Southland Bank has agreed to lend $500,000" to A & A. The SBA's Birmingham field office received the SBA application on April 2, 2001. The SBA application requested approval of a guarantee of a $500,000 loan to A & A.
Testimony at trial revealed that the normal practice or procedure at Southland Bank was to have the loan approved by the bank before the SBA application was sent to the SBA. Adkinson, however, had not taken A & A's loan request to his supervisor, Jon Sonmor, Southland Bank's senior credit officer, for approval. Adkinson testified that he felt that the "best chance" of getting the loan approved by Sonmor was to get the SBA guarantee first because A & A had a poor relationship with Southland Bank; A & A had missed numerous payments on equipment loans, and its checking account had been closed because of an excessive number of overdrafts.
SouthTrust Bank later telephoned Anderson for more information about the line of credit he had requested at the bank; at that time, Anderson indicated that he had taken care of the financing through another bank.
On April 17, 2001, the SBA application was approved and the SBA guaranteed 75% of a loan in the amount of $500,000. The guarantee contained numerous restrictions on the use of the loan proceeds and also required that certain properties put forth by A & A and Anderson as collateral be appraised and that the appraisal result in certain minimum fair-market values.
After Anderson learned from the SBA that the guarantee had been approved, he telephoned Adkinson. Anderson testified that Adkinson stated that "as soon as he got the paperwork, we would close the loan." Anderson testified that Adkinson indicated that Anderson "could go ahead and start doing whatever [he] needed to do to get the jobs and the operations going." A & A subsequently began placing bids and purchasing new inventory. Additionally, A & A committed to purchase and lease equipment and to lease new business locations in Georgia and Florida.
After the SBA application was approved, Adkinson took A & A's loan request to Sonmor. Sonmor was familiar with A & A because A & A's checking account had been closed as a result of overdrafts and because he was updated every other week on past-due loans and A & A was "usually" past due for over 30 days on its loan payments. Sonmor noted that, according to the financial statements submitted in support of the loan request, in A & A's best year, 2000, it was overdrawn by $139,000 at another bank. Furthermore, even with the SBA guarantee, Southland Bank's exposure was 25% of the loan, which would be secured only by second mortgages on several pieces of property, "accounts receivable inventory, and just a little bit of equipment." Sonmor testified that, based on his knowledge of A & A, "it just didn't make any sense to do the loan."
On May 10, 2001, Adkinson advised Anderson that Southland Bank was not *1202 going to write the loan. In early June, Southland Bank attempted to repossess equipment it had previously financed for A & A. Additionally, suppliers began to deny A & A purchases on credit because of late payments. Ultimately, A & A declared losses in 2001, 2002, and 2003.
In November 2002, A & A and Anderson (hereinafter collectively "the plaintiffs") sued Southland Bank and Adkinson (hereinafter collectively "the defendants"), seeking damages on claims of fraud against both Southland Bank and Adkinson, and breach of an implied contract, estoppel,[2] and negligent or wanton failure to train or supervise Adkinson against Southland Bank.[3] The complaint was later amended to seek damages for negligent or wanton failure to provide a loan against both Southland Bank and Adkinson. In July 2003, over two years after the denial of the loan, A & A was forced to close its Dothan store. Several of A & A's suppliers subsequently received judgments against A & A and Anderson.
The defendants filed a motion for a summary judgment arguing, among other things, that the plaintiffs' claims were precluded by the Statute of Frauds. The trial court denied the motion, but certified for an interlocutory appeal under Rule 5, Ala. R.App. P., the issue whether certain documents in the record constituted a written loan commitment for purposes of the Statute of Frauds. The defendants sought an interlocutory appeal with this Court, which was denied without an opinion.
In June 2006, the cause was heard by a jury. After the close of the plaintiffs' case, the defendants moved for a judgment as a matter of law ("JML"), which the trial court denied. This motion was renewed at the close of all the evidence. The jury returned a general verdict in favor of the plaintiffs on all claims except wanton failure to train and supervise. The jury awarded the plaintiffs $2,100,000 in compensatory damages and $5,505,000 in punitive damages.
The defendants filed a postjudgment motion renewing their previous motions for a JML and also moving for a new trial. The trial court denied the motion. The defendants then appealed to this Court; the case was referred to appellate mediation, which was ineffective.

Standard of Review
"When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant *1203 and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala. 1992)."
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala. 2003).

Breach of Contract
The defendants contend that the plaintiffs' breach-of-contract claim is barred by the Statute of Frauds. We agree.
First, we must make clear the contract at issue in this case. It appears undisputed that no actual loan contract or line-of-credit contract was executed. Anderson testified at trial several times that he was told by Adkinson that Southland Bank was "going to close the loan" or that it "would close the loan" at a future date, but that the loan closing never occurred. Additionally, the SBA guarantee specifically acknowledges that the loan has not been closed and requires numerous contingencies, including property appraisals and the execution of mortgages, none of which ever took place.[4] Although many of the proposed terms of an actual loan contract can be found in the record  such as an interest rate and payment requirements  the parties never actually closed the loan or executed a contract evidencing a loan.
Instead, the contract at issue would be a "loan commitment," which is a lender's binding promise to lend a borrower a specified amount of money in the future. Such a contract is described in Armstrong Business Services, Inc. v. AmSouth Bank, 817 So.2d 665, 673-74 (Ala.2001):
"The term `loan commitment' is defined as follows:
"`A lender's binding promise to a borrower to lend a specified amount of money at a certain interest rate, usu. within a specified period and for a specified purpose (such as buying real estate).'
"Black's Law Dictionary at 948 (West 7th ed.1999). This definition from Black's also references the term `mortgage commitment.' ...
"`....'
"... Generally, when a loan commitment is determined to be an enforceable contract, it is treated as an option purchased by the prospective borrower. See Peterson Dev. Co. v. Torrey Pines Bank, 233 Cal.App.3d 103, 284 Cal.Rptr. 367 (Cal.App. 4 Dist.1991); Capital Holding Corp. v. Octagon Dev. Co., 757 S.W.2d 202 (Ky.App.1988); and Analytical Design & Constr. Group, Inc. v. Murray, 690 P.2d 269 (Colo.App.1984). Alabama has no caselaw exactly on this point, but the definition and concept of a `loan commitment,' as explained in Black's and in the cases just cited, fit exactly with the general law in this state governing option contracts. See, e.g., Jenkins v. Thrift, 469 So.2d 1278 (Ala. 1985); Kennedy v. Herring, 270 Ala. 73, 116 So.2d 596 (1959)."
In order to establish a breach of contract, the plaintiffs were required to prove, among other things, the existence of a valid contract. Reynolds Metals Co. v. Hill, 825 So.2d 100, 105-06 (Ala.2002) (stating that one of the elements of a breach-of-contract claim is "a valid contract *1204 binding the parties ....").[5] The defendants argued in their motion for a JML and argue on appeal, however, that the loan commitment violates the Statute of Frauds. Thus, they argue, the agreement is void and there is no valid contract upon which to base a breach-of-contract claim. We agree.
The Statute of Frauds, Ala.Code 1975, § 8-9-2, generally provides that a loan or a commitment to make a loan of $25,000 or more must be in writing:
"In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
"....
"(7) Every agreement or commitment to lend money, delay or forebear [sic] repayment thereof or to modify the provisions of such an agreement or commitment except for consumer loans with a principal amount financed less than $25,000 ...."
The defendants argue that the evidence in this case establishes that there was no written promise or commitment to make a loan and further that there is no "note or memorandum thereof expressing the consideration." In support of this argument, the defendants cite Armstrong Business Services, Inc., which we find on point.
In Armstrong, Armstrong Business Services, Inc. ("ABS"), a corporation that operated several tax-preparation services, sought a loan from AmSouth Bank to finance the purchase of several tax-preparation-business franchises. ABS had a banking relationship with AmSouth and had maintained certain corporate accounts there for many years. ABS and its owner, Norris Armstrong, negotiated for several weeks with representatives of AmSouth, including Bo Marks  a loan officer  for a loan to finance the purchase of the franchises. 817 So.2d at 669-70.
During these negotiations, Armstrong and ABS requested a letter from Marks and AmSouth expressing AmSouth's interest in making the loan. ABS needed this letter to satisfy the franchisor that ABS would be able to finance the purchase. AmSouth provided such a letter expressing an interest in entering into a loan ("the November 14 letter"). AmSouth indicated that the November 14 letter was not a "commitment letter" but was instead a mere "letter of interest"; Armstrong, on the other hand, testified that he believed the November 14 letter was a commitment by AmSouth confirming oral discussions and agreements with Marks to finance the purchase of the franchises. 817 So.2d at 671. ABS subsequently entered into a contract to purchase the franchises. AmSouth later informed ABS that it would not extend the loan, citing insufficient collateral.
ABS sued AmSouth, asserting that Marks had made an oral commitment to lend ABS up to $5.2 million. ABS sought damages for, among other things, breach of contract, misrepresentation, and negligent or wanton hiring, retention, and supervision of employees. The trial court entered a summary judgment for AmSouth. *1205 On appeal, AmSouth contended that the trial court had correctly entered summary judgment on the breach-of-contract claim because the contract for a commitment to extend a loan violated the Statute of Frauds. We agreed:
"The trial court concluded that no writing or memorandum before the court expressed a consideration for a commitment by AmSouth to lend ABS $5.2 million, so that under the Statute of Frauds any agreement to that effect claimed by ABS would be void. The term `loan commitment' is defined as follows:
"`A lender's binding promise to a borrower to lend a specified amount of money at a certain interest rate, usu. within a specified period and for a specified purpose (such as buying real estate).'
"Black's Law Dictionary at 948 (West 7th ed.1999). This definition from Black's also references the term `mortgage commitment.' Black's defines `commitment fee':
"`An amount paid to a lender by a potential borrower for the lender's promise to lend money at a stipulated rate and within a specified time. Commitment fees are common in real estate transactions. See LOAN COMMITMENT.'
"Id. at 266. Generally, when a loan commitment is determined to be an enforceable contract, it is treated as an option purchased by the prospective borrower. See Peterson Dev. Co. v. Torrey Pines Bank, 233 Cal.App.3d 103, 284 Cal.Rptr. 367 (Cal.App. 4 Dist.1991); Capital Holding Corp. v. Octagon Dev. Co., 757 S.W.2d 202 (Ky.App.1988); and Analytical Design & Constr. Group, Inc. v. Murray, 690 P.2d 269 (Colo.App. 1984). Alabama has no caselaw exactly on this point, but the definition and concept of a `loan commitment,' as explained in Black's and in the cases just cited, fit exactly with the general law in this state governing option contracts. See, e.g., Jenkins v. Thrift, 469 So.2d 1278 (Ala. 1985); Kennedy v. Herring, 270 Ala. 73, 116 So.2d 596 (1959).
"....
"... [W]e must determine whether one of the writings in this record ... contains an expression of consideration for an agreement by AmSouth to lend money to ABS. We make this determination in light of this Court's discussion of consideration in Ex parte Grant, 711 So.2d 464, 465 (Ala.1997):
"`"A test of good consideration for a contract is whether the promisee at the instance of the promisor has done, forborne or undertaken to do anything real, or whether he has suffered any detriment, or whether in return for the promise he has done something he was not bound to do, or has promised to do some act or to abstain from doing something."
"`Roberts v. Lindsey, 242 Ala. 522, 525, 7 So.2d 82, 84 (1942); Russell v. Russell, 270 Ala. 662, 668, 120 So.2d 733, 738 (1960). "[T]o constitute consideration for a promise, there must have been an act, a forbearance, a detriment, or a destruction of a legal right, or a return promise, bargained for and given in exchange for the promise." Smoyer v. Birmingham Area Chamber of Commerce, 517 So.2d 585, 587 (Ala.1987).'
"(Emphasis added [in Armstrong].) See also Kelsoe v. International Wood Prods., Inc., 588 So.2d 877 (Ala.1991)."
Armstrong, 817 So.2d at 673-75.
None of the writings found in the record in Armstrong contained an "explicit reference to consideration that would fit within *1206 the [Ex parte] Grant [, 711 So.2d 464 (Ala. 1997,)] definition." 817 So.2d at 675. A document that showed a proposed interest rate and an amortization schedule for the loan showed, at most, consideration for the proposed loan contract  not consideration for a commitment to lend money. Furthermore, evidence indicating that ABS had agreed to purchase the franchises did not constitute a showing of consideration. Additionally, AmSouth did not receive a benefit from the purchase of the franchises, and the purchase was not made in return for AmSouth's promise to lend money. At most, the documents in the evidence showed only "anticipated consideration by ABS to AmSouth concerning the proposed loan." We stated:
"None of the ... writings ABS relies on shows consideration for a loan commitment, and our careful examination of the record has located no other writing showing consideration for a contract by AmSouth to lend money to ABS. That is, the record contains no writing showing that ABS has given AmSouth anything, or has performed, or refrained from performing, any act for the benefit of AmSouth, in exchange for AmSouth's commitment to lend ABS money. Accordingly, we conclude that the trial court correctly entered the summary judgment for AmSouth on ABS's count alleging breach of contract."
817 So.2d at 676.
As noted above, commitments to lend money are explicitly contemplated by § 8-9-2(7) ("[e]very agreement or commitment to lend money" (emphasis added)). It is undisputed that the parties did not execute an express or formal loan-commitment agreement in which Southland Bank promised to lend the plaintiffs a specified amount of money in exchange for consideration. Anderson testified:
"[Defendants' counsel:] Now, did you have any written agreement provided to you between yourself and Southland Bank with regard to them loaning you money?
"[Anderson:] Do you mean other than the SBA application?
"[Defendants' counsel:] I'm asking you [if there was] any agreement between yourself and Southland Bank whereby they agreed in writing to loan you money?
"[Anderson:] Southland Bank did not give me anything in writing stating it was going to make this loan."
We thus examine whether there is some "note or memorandum" of the purported loan commitment that expresses the consideration in writing.
The plaintiffs contend that three documents in the record, "construed together," constitute a "memorandum" of the loan commitment and express the consideration for the agreement by Southland Bank to lend A & A money. Specifically, the SBA application states that Southland Bank and A & A "propose" to enter into a guaranteed loan, and the credit analysis states that "Southland Bank has agreed to lend $500,000." The plaintiffs argue that both of these documents express the terms of the loan commitment. The plaintiffs further argue that an SBA form entitled "Compensation Agreement for Services in Connection with Application and Loan from (Or in Participation With) Small Business Administration" ("the compensation form") expresses in writing that A & A paid $1,000 for the loan commitment.
We agree that the SBA application and the credit analysis would specify terms for the loan anticipated by the purported loan commitment. However, we must determine whether the compensation form "contains an expression of consideration for an agreement by [Southland Bank] to *1207 lend money to [A & A]." Armstrong, 817 So.2d at 675. We hold that it does not.
The compensation form appears to be intended to disclose to the SBA that compensation was paid for services in connection with the submission of the application.[6] The compensation form recites that The Mortgage Resource Group, the group Watt worked for, which was specified in the compensation form as the "undersigned representative," agreed that it would not receive "any payment in connection with the application for or the making of the loan except for services actually performed" on behalf of A & A, which is listed as the "Applicant." Further, the compensation form recites that the "undersigned Applicant and representative hereby certify that no other fees have been charged or will be charged by the representative in connection with this loan ...." The compensation form also states that $1,000 was paid in "total compensation."[7]
Although the compensation form indicates that services were performed "on behalf of [A & A]," the form does not actually say who paid the $1,000.[8] In any event, the compensation form does not state that the compensation was paid for a loan commitment, much less a commitment by Southland Bank to A & A. Thus, on its face, the compensation form cannot be held to express in writing the consideration of a loan commitment.
Nevertheless, the plaintiffs point to extrinsic evidence that allegedly indicates that Watt worked on "behalf" of Southland Bank. The $1,000 A & A paid to Watt, they argue, "benefitted [Southland] Bank [and] was given by A & A Drywall for the Bank's commitment to extend the loan." Plaintiffs' brief at 34.[9] Thus, the plaintiffs maintain that the $1,000 payment stated in the compensation form would indeed express, in writing, consideration paid for a loan commitment. We hold, however, that there is not substantial evidence in the record to support these assertions.
Watt did not testify at trial. Watt signed the compensation form as a representative of an entity called The Mortgage Resource Group, not Southland Bank. Additionally, L.D. Ralph, an employee of the SBA called to testify by the plaintiffs, stated that he knew Watt as an "independent processor." The only evidence regarding Watt's relationship with Southland Bank is as follows: portions of Adkinson's deposition were read at trial, and in his deposition Adkinson stated that he had known *1208 Watt for three or four years and that she helped individual companies and small businesses obtain SBA loans. When asked if he referred customers to Watt, Adkinson stated "I have" because Watt does the paperwork and processing of SBA applications. When asked on whose behalf she does the paperwork, Adkinson stated "I guess both the bank and the individual." Adkinson could not remember if he had arranged for Watt to telephone Anderson or if he had told Anderson to telephone Watt. Adkinson further stated that he told Anderson that Watt was "the one that can help you put the package together and do a much better job with it than I can."
The plaintiffs' counsel later asked Adkinson the following:
"[Plaintiffs' counsel:] ... [D]idn't you earlier testify that Cindy Watt worked on behalf of the bank?
"[Adkinson:] She put the package together. If that is working on behalf of the bank, I guess, it is."
The plaintiffs cite this testimony to support their assertion that "Watt worked on behalf of [Southland] Bank to put the application together." Plaintiffs' brief at 16.
Adkinson qualified his answer on the premise that, if putting together the package was working on behalf of Southland Bank, then he "guess[ed]" Watt had worked on behalf of Southland Bank. Of course, Adkinson also testified that Watt worked on behalf of both "the bank and the individual"; that Watt was not employed by Southland Bank; that she had no affiliation with Southland Bank; and that Southland Bank did not receive any portion of the money Watt charged for putting together an SBA-loan package. However, assuming that Adkinson's equivocal testimony constitutes evidence that Watt worked "on behalf" of Southland Bank, and further assuming that working "on behalf" of Southland Bank means that the $1,000 compensation flowed from Watt to Southland Bank or that Southland Bank otherwise "benefited" from Watt's work (which the record does not state), those assertions do not resolve the issue whether Watt's $1,000 fee is consideration for a loan commitment, nor do they show that the compensation form expresses consideration for purposes of the Statute of Frauds.
As noted in Armstrong, if the $1,000 fee given to Watt is to constitute consideration, it must have been given by A & A in exchange for or in return for the promise by Southland Bank to extend the loan. 817 So.2d at 675-76. Anderson's testimony at trial, however, reveals that this is not the case. Anderson stated:
"[Plaintiffs' counsel:] Did you and Jimmy Adkinson have a discussion about how to go about getting or obtaining an SBA guarantee?
"[Anderson:] Yes, ma'am.
"[Plaintiffs' counsel:] And what discussion did you have with him?
"[Anderson:] Mr. Jimmy told me that he had the forms, if I wanted to fill them out. But he didn't recommend that. And he gave me the card to someone he said they used to fill out the forms.
"[Plaintiffs' counsel:] That card was who?
"[Anderson:] Cindy Watt."
Anderson's undisputed testimony reveals that A & A had the opportunity and the option to complete the SBA paperwork itself without using Watt's services. The testimony at trial by both sets of parties indicated that the purpose of Watt's services was simply to ease the process and to help both the plaintiffs and the defendants  not that Watt's services were required. There is no evidence from which a jury could conclude that Watt's services were required by Southland Bank.
*1209 When the above-stated facts and evidence are viewed in the light most favorable to the plaintiffs, nothing in the record allows the reasonable inference that Anderson was required to use Watt's services in exchange for or in return for the loan commitment. In fact, Anderson testified that he would not have owed Watt any money had the SBA not approved the application. As we stated in Foy v. Foy, 484 So.2d 439, 443 (Ala.1986), in discussing the failure of an option contract to state consideration as required by the Statute of Frauds: "`There must be some consideration on which the finger may be placed and of which it may be said, "this was given by [A & A] to [Southland Bank], as the price for the [loan commitment]."...'" (quoting 77 Am. Jur.2d Vendor and Purchaser § 34 at 214 (1975)). Because the payment of $1,000 to Watt was not required in exchange for the loan commitment, the compensation form is not a writing containing "an expression of consideration" for a loan commitment by Southland Bank.
Because there is no written loan commitment or "note or memorandum thereof expressing the consideration," any purported loan commitment by Southland Bank to A & A is void under the Statute of Frauds.[10] As in Armstrong:
"None of the three writings [A & A] relies on shows consideration for a loan commitment, and our careful examination of the record has located no other writing showing consideration for a contract by [Southland Bank] to lend money to [A & A]. That is, the record contains no writing showing that [A & A] has given [Southland Bank] anything, or has performed, or refrained from performing, any act for the benefit of [Southland Bank], in exchange for [Southland Bank's] commitment to lend [A & A] money."
817 So.2d at 676. See also Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988) ("the memorandums must state all essential elements over the signature of the party to be charged, including, but not limited to, the element of consideration"); Foy v. Foy, 484 So.2d 439 (Ala.1986) (holding that the failure of an option agreement to contain a statement of the consideration rendered it void under the Statute of Frauds); and Baldwin County v. Purcell Corp., 971 F.2d 1558, 1565 (11th Cir.1992) (holding that a contract that must comply with the Statute of Frauds "is void and unenforceable without consideration stated in the written agreement"). There being no valid contract, there can be no action for breach of contract. Therefore, the trial court erred in refusing to grant the defendants' motion for a JML on the plaintiffs' breach-of-contract claim, and the trial court's judgment is due to be reversed on this ground.

Fraud
As to the fraud claim, the defendants argued in their motion for a JML made at the close of the plaintiffs' case that the plaintiffs' fraud claim was actually a claim of promissory fraud. Further, the defendants maintained that there was no evidence of an intent to deceive  a material element of promissory fraud  and that there was thus "absolutely a void of evidence with regard to any type of fraud in this case." On appeal, the defendants again maintain that the plaintiffs' fraud *1210 claim "fails to allege any single then-existing material fact"; that the "only `fraud' actually alleged" by the plaintiffs was promissory fraud; that there was no evidence of an intent to deceive; and that the fraud claim thus should not have been submitted to the jury. Defendants' brief at 36, 19, 21.
"A claim of promissory fraud is `one based upon a promise to act or not to act in the future.'" Ex parte Michelin North America, Inc., 795 So.2d 674, 678 (Ala.2001) (quoting Padgett v. Hughes, 535 So.2d 140, 142 (Ala.1988)).
"`The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim ..., two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.'"
Michelin North America, 795 So.2d at 678-79 (quoting Padgett, 535 So.2d at 142).
Rule 9(b), Ala. R. Civ. P., requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In their complaint, the plaintiffs alleged that Adkinson represented that Southland Bank "would" enter into a loan contract if A & A were able to obtain the SBA guarantee:
"Defendant [Southland Bank], by and through its agent, servant and/or employee, [Adkinson] represented to Plaintiffs the following:
"(a) that [Southland Bank] would extend the requested $500,000 line of credit if [A & A] were able to obtain approval from the Small Business Administration (SBA) to guarantee the loan; and,
"(b) that the loan would close as soon as the paperwork with the SBA approval number came into the [Southland Bank]."
(Emphasis added.)[11] In accord with the complaint, Anderson testified at trial that Adkinson indicated that "Southland Bank would do a loan if the SBA guaranteed it." (Emphasis added.) The allegations in the complaint and the testimony at trial all contemplate representations of future performance on the part of the defendants.
The allegations in the complaint and the evidence at trial are similar to the facts and circumstances presented in Graham Foods, Inc. v. First Alabama Bank, 567 So.2d 859 (Ala.1990). In Graham Foods, Graham Foods, a seafood processing business, sought an increase in an existing line of credit with First Alabama Bank. Representatives of Graham Foods met with a vice president and branch manager of the bank, Hicks, to negotiate an increase in Graham Foods' line of credit. According to the testimony, Hicks told representatives of Graham Foods that the bank would grant the loan.
While the loan was purportedly being processed and reviewed by a credit committee at the bank, Graham Foods began writing checks drawn on its account to purchase inventory and to expand its operations. Hicks gave assurances that those checks would be paid. Ultimately, the bank did not approve the line of credit, and Graham Foods' account was overdrawn.
*1211 Hicks later denied ever assuring Graham Foods that the loan would be approved, and he testified that, at the time of the loan application, Hicks did not know whether the loan would be approved. Graham Foods sued the bank, alleging, among other things, fraud and misrepresentation. We described these claims as follows:
"The alleged fraud consists of Hicks's alleged statements that the bank would lend Graham Foods the additional money and that the overdraft charges would be `reversed' .... Graham Foods concedes that its complaint alleges only promissory fraud, because the alleged misrepresentations concerned actions to be taken in the future. Because fraud requires a misrepresentation of a material existing fact, an action for promissory fraud requires proof of the promisor's intent at the time of making the representation not to perform the act promised, that is, proof that he had a present intent to deceive."
567 So.2d at 861 (first emphasis added).
In the instant case, Adkinson's promises that Southland Bank would extend a loan to the plaintiffs is a promise to perform a future act: that Southland Bank would, at some point in the future, enter into a loan agreement with the plaintiffs if the SBA issued a loan guarantee. This is no different than the promise in Graham Foods that a loan would be extended. Any species of fraud based on the promise to do something in the future in this case would be a claim of promissory fraud. Armstrong, supra (holding that AmSouth's breach of a purported promise to enter a loan involved a claim of promissory fraud), and Graham Foods, supra. The plaintiffs disagree with the defendants' contention that this case involves promissory fraud. They argue in their brief:
"Plaintiffs' claims concern a promise of an existing fact  a promise of a loan. That is a material existing fact. George v. Associated Doctors Health & Life Ins. Co., 675 So.2d 860 (Ala.1996). The misrepresentations are not contingent on some future `promise' but are grounded in facts. White v. State Farm Fire & Cas. Co., 953 So.2d 340, 352-353 (Ala. 2006). Plaintiffs' fraud claims were not promissory fraud claims. Therefore, Plaintiffs were not required to show an intent to deceive and this should not even be an issue on appeal."
Plaintiffs' brief at 44-45.
The plaintiffs appear to claim that a promise of a future loan is actually a representation of an existing fact; however, as in Armstrong and Graham Foods, a representation to lend money in the future is a promise to perform a future act. The plaintiffs' argument is unpersuasive and contradicts both the complaint and testimony at trial.[12] We thus conclude that the plaintiffs' fraud claim is in the nature of a claim of promissory fraud.
The defendants, in their motion for a JML, argued that the plaintiffs *1212 failed to present evidence that the defendants had an intent to deceive Anderson. We agree.
"The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive. Martin v. American Medical Int'l, Inc., 516 So.2d 640 (Ala.1987); P & S Bus., Inc. v. South Cent. Bell Tel. Co., 466 So.2d 928 (Ala.1985). The plaintiff cannot meet his burden merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud. Purcell Co. v. Spriggs Enterprises, Inc., 431 So.2d 515, 519 (Ala.1983). It is well settled that `a jury does not have untrammeled discretion to speculate upon the existence of [the requisite] intent [for promissory fraud].' There must be substantial evidence of a fraudulent intent that existed when the promise was made. Martin, 516 So.2d at 642 (quoting Purcell Co., 431 So.2d at 519)."
Goodyear Tire & Rubber Co. v. Washington, 719 So.2d 774, 776 (Ala.1998). See also Trum v. Melvin Pierce Marine Coating, Inc., 562 So.2d 235, 237 (Ala.1990) ("[I]n order for a promise to constitute a fraudulent misrepresentation, there must have been at the time the promise was made an intention not to perform, and such a promise must have been made with the intent to deceive."); Clanton v. Bains Oil Co., 417 So.2d 149, 151 (Ala.1982) ("A promise, to constitute fraud, must be made with the intent not to perform it."). Evidence of consistent, but unfulfilled, promises can in some cases amount to substantial evidence of an intent to deceive. Goodyear Tire, 719 So.2d at 777; Campbell v. Naman's Catering, Inc., 842 So.2d 654, 659 (Ala.2002). Additionally, "[a] defendant's intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made." Byrd v. Lamar, 846 So.2d 334, 343 (Ala. 2002). However, misrepresentations made recklessly or innocently will not sustain an action for promissory fraud. Graham Foods, 567 So.2d at 862 ("Reckless misrepresentation will not support a charge of promissory fraud."), and City of Prattville v. Post, 831 So.2d 622, 629 (Ala.Civ.App. 2002) (holding that, because promissory fraud required proof that the defendant did not intend to perform the act promised and had an intent to deceive, a claim of promissory fraud based on an implied or negligent representation "could not be sustained....").
The evidence at trial in this case reveals no prior instances of unfulfilled promises by Adkinson to the plaintiffs and no actions that occurred after the promise that reflect on any intent to deceive. In fact, the evidence shows that Adkinson sought to have an SBA guarantee before he submitted the loan to Sonmor in order to maximize the chances that the loan would be approved, and there is no direct evidence at all indicating that Adkinson intended not to fulfill the promise to issue the loan. Goodyear Tire, 719 So.2d at 776 (finding no evidence of intent to deceive because the evidence "does not include direct documentary evidence, or direct testimony, indicating that [one of the defendants] intended not to fulfill the promises made to [the plaintiff], nor does it include indirect evidence of similar promises made to [the plaintiff] or to others").
Further, the testimony at trial by Anderson indicated that he and his family had had a long-term business relationship with Adkinson, that he trusted Adkinson and his judgment, and that he followed Adkinson to various banks to continue to do business with him. There is no apparent motive for Adkinson to deceive Anderson  neither Adkinson nor Southland *1213 Bank received a profit from denying the loan.
The plaintiffs, however, argue the following:
"This is not a case where a party changed his mind and `merely failed' to perform. Plaintiffs presented substantial circumstantial evidence supporting Plaintiffs' contention that Defendants misrepresented that Southland Bank would extend the requested $500,000 loan and that the loan would close as soon as the paperwork with the SBA approval number came into the Bank. Defendants knew that these statements were not true. Defendant Jimmy Adkinson, the Bank's Senior Vice-President, made an oral promise that was contrary to established bank policy. It was contrary to the Bank's established procedure for Jimmy Adkinson to sign off on the SBA application and other related documents and forward that application and related documents to the SBA without having first gotten approval for the issuance of the loan. Plaintiffs presented sufficient evidence to create a genuine issue of material fact as to whether Defendants made the representations with a present intent to deceive or with the intent not to perform as promised."
Plaintiffs' brief at 46-47.
First, the contention that Adkinson intentionally violated Southland Bank's procedures is hard to square with Sonmor's unclear testimony as to whether any particular procedures for SBA loans actually existed[13] and the plaintiffs' contention that Adkinson was not properly trained on the bank's policies in the first place. However, assuming that the jury could determine that procedures existed and that Adkinson intentionally violated them, which the standard of review requires us to do, this does not show an intent to deceive  in fact, the only apparent inference from the testimony at trial would be that Adkinson took these actions to improve the chances that the loan would ultimately be approved. There is certainly no evidence from which one could conclude that Adkinson "knew" that his statements to Anderson "were not true." Again, Graham Foods is illustrative on this point. In holding that there was no substantial evidence of an intent to deceive, we stated:
"[T]here was no proof in this case that Hicks intended for the bank not to increase the line of credit or that he intended to deceive [Graham Foods' representatives] when he allegedly promised that the loan would be approved. Graham Foods argues that Hicks's testimony, that he had no way of knowing whether the credit committee would approve the loan and that he did not assure [Graham Foods' representatives] of the loan's approval, is evidence that the representations to which they have testified were false. ...
"Nevertheless, a finding that Hicks promised the loan, coupled with the fact of his denial of such a promise, does not prove intent to deceive. It tends to prove that he recklessly made statements beyond his authority, but not that he intended that Graham Foods not receive the loan or that he intended to deceive [Graham Foods' representatives]. Reckless misrepresentation will not support a charge of promissory fraud. Benetton Services Corp. v. Benedot, Inc., 551 So.2d 295 (Ala.1989); Kennedy Electric Co. v. Moore-Handley, *1214 Inc., 437 So.2d 76 (Ala.1983). Thus, the assurances that Graham Foods would receive the loan will not support a fraud claim."
567 So.2d at 862.
There is simply no evidence in the record to allow the inference that, at the time of the promise of the loan, Adkinson either intended to deceive Anderson or had no intention of carrying out the promise. Instead, the evidence shows that Adkinson actually attempted to have the loan approved. Like the defendant in Graham Foods, Adkinson may have recklessly made statements beyond his authority, but the fact that Adkinson may have violated Southland Bank's procedures and policies does not tend to show "that he intended that [A & A and Anderson] not receive the loan or that he intended to deceive." Graham Foods. See also Pavco Indus., Inc. v. First Nat'l Bank of Mobile, 534 So.2d 572, 576 (Ala.1988) (holding that the evidence demonstrated that a loan officer had no present intent to deceive at the time he made the representations concerning continuance of the line of credit); Russellville Production Credit Ass'n v. Frost, 484 So.2d 1084 (Ala.1986) (holding that there was no evidence an officer of a credit association had an intent to deceive when he promised to "go along" on a crop loan); and Gloor v. BancorpSouth Bank, 925 So.2d 984 (Ala.Civ.App.2005) (holding that the evidence did not show an intent to deceive where a bank officer promised plaintiff that the bank would lend "new monies" if the borrower would returned a certificate of title to the bank).
The facts and evidence before the trial court, viewed in the light most favorable to the plaintiffs, does not present any evidentiary basis for a reasonable juror to conclude that Adkinson intended to deceive Anderson. Because there was no evidence of intent to deceive, the trial court erred in denying the defendants' motion for a JML and submitting that claim to the jury.[14]

Negligent Training and Supervision
The defendants also contend that a judgment should be rendered in their favor on the plaintiffs' claim that Southland Bank was negligent in failing to train and to supervise Adkinson.[15]
"`"In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing *1215 them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care."`
"Big B, Inc. v. Cottingham, 634 So.2d 999, 1003 (Ala.1993) (quoting Lane v. Central Bank of Alabama, N.A., 425 So.2d 1098, 1100 (Ala.1983) (quoting Thompson v. Havard, 285 Ala. 718, 725, 235 So.2d 853 (1970)))."
Armstrong, 817 So.2d at 682.
The plaintiffs alleged in their complaint that Southland Bank "knew or should have known that [Adkinson] was unfit to act as its employee, servant and/or agent, and [Southland Bank] was negligent and/or wanton in allowing [Adkinson] to contact the public on its behalf." The plaintiffs further argue that the evidence shows that Sonmor "had actual or presumed knowledge of Adkinson's incompetency to handle SBA loans" because, they say, Adkinson had no training on SBA guarantees and he had never received any manuals on them. Plaintiffs' brief at 48.
First, the issue in this case is not whether Adkinson was incompetent at handling SBA applications  there is no assertion that the actual SBA application in this case was incorrectly executed, and, in fact, the application was approved. Instead, the issue is whether liability stems from Adkinson's telling the plaintiffs that Southland Bank would issue a loan if the SBA approved the guarantee, even though Adkinson did not know if the loan would actually be approved.[16] In regard to the negligent-failure-to-supervise-and-train claim, we must determine if the evidence is sufficient for the question whether Adkinson's actions were the result of the facts that he was incompetent and that Southland Bank knew or should have known of this incompetency to go to the jury for its consideration. Armstrong, 817 So.2d at 682.[17]
"`[I]ncompetency is connected conjunctively with carelessness, indifference, heedlessness and recklessness.... "Incompetency, as related to the law of negligence, connotes `want of ability suitable to the task, either as regards natural qualities or experience, or deficiency of disposition to use one's abilities and experience properly. Incompetency connotes the converse of reliability. The term may include something more than physical and mental attributes; it may include want of qualification generally, such as habitual carelessness, disposition, and temperament.'"'

*1216 "McGowin v. Howard, 251 Ala. 204, 207-08, 36 So.2d 323, 325 (1948)."
Joyner v. B & P Pest Control, Inc., 853 So.2d 991, 999 (Ala.Civ.App.2002).
A mistake or single act of negligence on the part of an employee does not establish incompetency: "Negligence is not synonymous with incompetency. The most competent may be negligent. Alabama City, G. & A. Ry. Co. v. Bessiere, 190 Ala. 59, 66 So. 805 [(1914)]; McGowin v. Howard, 246 Ala. 553, 21 So.2d 683 [(1945)]. But one who is habitually negligent may on that account be incompetent." Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 941 (Ala.2006).
Again, a similar issue was raised in Armstrong. In that case, ABS and Armstrong argued that a genuine issue of material fact existed as to whether AmSouth had negligently supervised Marks because the evidence indicated:
"(1) [T]hat Marks was allowed to analyze the loan request from ABS and send the November 14 letter despite the fact that Marks was not authorized to lend that amount of money; (2) that Marks had never handled a loan of this size before; (3) that Marks's college major was political science, and he had no formal training in banking other than what he had received at AmSouth; (4) that Marks was not familiar with the policies of AmSouth; (5) that Marks did not tell Armstrong that the November 14 letter was a `letter of interest' only, and not an agreement to lend up to $5.2 million; (6) that Marks's November 14 letter indicates that the application for the loan would be submitted for `formal credit approval,' but Marks never submitted the application; and (7) that Marks's failure to complete and submit the loan application caused damage to ABS."
817 So.2d at 682 (emphasis added). We held that this evidence was insufficient to warrant submission of the claim to the jury, and we thus affirmed the trial court's summary judgment:
"However, the evidence offered by ABS does not constitute substantial evidence of negligent or wanton supervision. It is not sufficient merely to allege, or to show, that the employee acted incompetently. A plaintiff must establish `by affirmative proof' that the employer actually knew of the incompetence, or that the employer reasonably should have known of it. Lane v. Central Bank, 425 So.2d 1098, 1100 (Ala.1983), quoting Thompson v. Havard, 285 Ala. 718, 723, 235 So.2d 853, 858 (Ala.1970). To carry this burden, the plaintiff may show either that he informed the employer about specific misdeeds of the employee, or that the employee's misdeeds were `of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.' Lane, 425 So.2d at 1100. This Court, in Lane, held that a borrower had failed to establish that a bank had negligently supervised a bank officer who, the borrower alleged, required that part of the borrower's loan proceeds be loaned to the officer. `Assuming Lane has been damaged by the acts of Mills, ... he has not established that the damage occurred because of any incompetency on Mills's part for which the bank might conceivably be liable.' Id. at 1100. The arguments offered by ABS amount to no more than accusations that Marks did not handle the loan request properly. ABS argues that because Marks may have made mistakes, AmSouth must have negligently or wantonly supervised him. However, these accusations do not amount to proof that AmSouth *1217 was aware of and, negligently or wantonly, disregarded acts of incompetence by Marks that damaged ABS. Lane, supra."
817 So.2d at 683 (emphasis added).
The evidence presented at trial in the instant case shows that Adkinson told Anderson that the loan would approved if the SBA guaranteed it, without first submitting the loan to his superiors for approval. This instance would not reasonably allow the inference by a jury of a "`want of ability suitable to the task, either as regards natural qualities or experience, or deficiency of disposition to use one's abilities and experience properly ... [or] ... the converse of reliability,'" Joyner, 853 So.2d at 999 (quoting McGowin, 251 Ala. at 207-08, 36 So.2d at 325), or "`repeated acts of carelessness and incompetency.'" Armstrong, 817 So.2d at 682 (quoting Big B, Inc. v. Cottingham, 634 So.2d 999, 1003 (Ala.1993)). Instead, it at best shows a "mistake or single act of negligence," Pritchett, 938 So.2d at 941, or that Adkinson, like the defendant in Armstrong, "did not handle the loan request properly," 817 So.2d at 683. This evidence is insufficient to submit the claim to the jury; therefore, the trial court erred in denying the defendants' motion for a JML.

Negligent or Wanton Failure to Provide a Loan
The plaintiffs' final claim is that the defendants were negligent or wanton in failing to provide a loan. Specifically, the complaint alleged that the defendants "were negligent and/or wanton in failing to provide to Plaintiffs a $500,000 line of credit once the Small Business Administration (SBA) had guaranteed the loan."
In their motion for a JML, the defendants argued that there was "no contract... in this case to establish a duty to make a loan." On appeal, the defendants again argue that "duty" was an essential element to the negligence or wantonness claim but that they had no duty to provide a loan "outside of an agreement to do so." Defendants' brief at 33. In support of their argument, the defendants cite Armstrong, supra, and Cahaba Seafood, Inc. v. Central Bank of the South, 567 So.2d 1304 (Ala. 1990). In Armstrong, we rejected the argument by ABS that a duty to "properly process" the loan request arose apart from any contractual claim. Specifically, ABS alleged that AmSouth and Marks were negligent or wanton in connection with Marks's handling of ABS's loan request and that Marks "had negligently or wantonly failed to complete a loan-approval form and submit it to the appropriate authorities at AmSouth." 817 So.2d at 679. We noted that the trial court "rejected this claim, holding that AmSouth had owed ABS no duty outside `the alleged loan agreement.'" 817 So.2d at 679. We stated the applicable law as follows:
"The elements of a negligence claim are a duty, a breach of that duty, causation, and damage. AALAR, Ltd., Inc. v. Francis, 716 So.2d 1141, 1144 (Ala.1998). At common law, a duty of due care can accompany a contractual obligation; see Pugh v. Butler Tel. Co., 512 So.2d 1317, 1319 (Ala.1987). In addition, a duty of due care can arise in the absence of a contract, based on `a number of factors, including public policy, social considerations, and foreseeability [of harm].' Smitherman v. McCafferty, 622 So.2d 322, 324 (Ala.1993). `The ultimate test of the existence of a duty to use due care is found in the foreseeability that harm may result if care is not exercised.' Buchanan v. Merger Enters., Inc., 463 So.2d 121, 126 (Ala.1984). `Due care is relative always and much depends upon the facts of the particular case.' Cox v. Miller, 361 So.2d 1044, 1048 (Ala.1978).

*1218 "This Court has defined `wanton conduct':
"`"[The] doing of some act or something with reckless indifference to the consequences of said act, or ... a failure or omission to do something, with reckless indifference to the consequences of such failure or omission, that is, that the party acting or failing to act is conscious of his conduct, and even though without any actual intent to injure is aware from his knowledge of existing circumstances and conditions that his conduct would probably result in injury to another or in damage to his property."'
"Weatherly v. Hunter, 510 So.2d 151, 152 (Ala.1987), quoting W.T. Ratliff Co. v. Purvis, 292 Ala. 171, 291 So.2d 289 (1974)."
Armstrong, 817 So.2d at 679-80.
We held that AmSouth owed no contractual duty in Armstrong, because the loan-commitment contract was barred by the Statute of Frauds. Additionally, previous caselaw, i.e., Cahaba Seafood, Inc., supra (holding that outside of the line-of-credit contract at issue in that case there was no duty to lend money), and Tharp v. Union State Bank, 364 So.2d 335 (Ala.Civ.App. 1978) (holding that a bank had no duty, outside the terms of a contract to lend money, to extend additional loans to a prospective borrower), holds that a duty to lend money generally does not arise outside the confines of a contract.
The plaintiffs argue, however, that a common-law duty arose in this case:
"Alabama recognizes the `undertake a duty' doctrine. That doctrine provides that one who chooses to commence an undertaking, though he may do so voluntarily, is thence duty bound to complete the task in a non-negligent fashion. Smith v. Atkinson, 771 So.2d 429 (Ala. 2000). The existence of a voluntarily-assumed duty through affirmative conduct is a matter for determination `in light of all the facts and circumstances.' Chandler v. Hosp. Auth. of the City of Huntsville, 548 So.2d 1384, 1387 (Ala. 1989).
"Even if Southland Bank was under no contractual duty to aid A & A Drywall in obtaining SBA approval of the loan, once the Bank agreed to help Plaintiffs procure the approval, it assumed a duty to act with care. Southland Bank had a duty to complete the task in a non-negligent and non-wanton fashion."
Plaintiffs' brief at 41-42. The plaintiffs further cite First Federal Savings & Loan Association of Hamilton v. Caudle, 425 So.2d 1050 (Ala.1982), in support of their argument.
In First Federal, the Caudles sought a loan from a bank to finance the construction of a house. The bank would not make a loan to the Caudles but suggested that the Caudles apply for a Federal Housing Administration ("FHA") loan. The bank agreed to "process the papers" for obtaining such a loan, for which it would receive an origination fee.
Subsequently, the bank mistakenly told the Caudles that the loan had been approved, and the Caudles began construction on the house. When it was discovered that the loan had not been approved, the Caudles were forced to accept a more expensive loan; they successfully sued the bank for damages based on theories of negligence and wantonness.
On appeal, the bank contended that any "loan commitment" in that case was not supported by consideration and that any agreement to assist in the loan was not in writing and thus was void under the Statute of Frauds. This Court found "no merit" *1219 in these arguments and held that the bank had "agreed to process and handle the loan application" and that the agreement was supported by consideration.
The bank further argued that it was "under no duty" to actually "service" the FHA loan. We found this argument to be "without merit": "Although [the bank] was under no duty to help procure a federally subsidized loan for the Caudles, once it voluntarily agreed to assist the Caudles, it was required to act with due care." 425 So.2d at 1052.
It is true that "`Alabama clearly recognizes the doctrine that one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care and is liable for negligence in connection therewith.' Dailey v. City of Birmingham, 378 So.2d 728, 729 (Ala.1979)." Smith v. Atkinson, 771 So.2d 429, 433 (Ala.2000). In the instant case, Adkinson and Southland Bank arguably undertook a duty to process the SBA application; this was done, and done correctly  the SBA application was approved, and, unlike First Federal, this approval was accurately communicated to the plaintiffs. We find our previous discussion in Holman v. Childersburg Bancorporation, Inc., 852 So.2d 691 (Ala.2002), which is relied upon by the defendants, more persuasive.
In Holman, the Holmans borrowed $275,000 from a bank in connection with the purchase of real property. The loan was secured by a mortgage on that property, which was subsequently subdivided into three tracts  tract I, tract II, and tract III.
The Holmans alleged that they reached an oral agreement with the bank pursuant to which the Holmans would sell tract I to satisfy a portion of the mortgage on both tracts I and II so that the Holmans could obtain a construction loan to build a residence on tract II. Tract I was eventually sold and that tract was released from the mortgage lien; however, tract II was never released from the mortgage lien. The Holmans subsequently sued the bank alleging, among other things, breach of a contract and negligence and wantonness. The trial court entered a summary judgment for the bank, and the Holmans appealed.
The Holmans' breach-of-contract claim was barred by the Statute of Frauds. The bank contended on appeal that the Holmans' tort claims were also barred by the Statute of Frauds. We noted that the bank argued that the only duty alleged in the case was "`predicated upon an alleged contractual duty to release land from a mortgage; thus, the [Holmans'] claims of negligence are actually claims arising in contract.'" 852 So.2d at 699 (quoting the bank's brief). The Holmans' allegation was that the bank's negligent and/or wanton conduct consisted of the refusal to honor the purported contract. 852 So.2d at 700. However, because there was no contract requiring the bank's performance, the bank owed no duty. We further stated:
"As a general rule, `[i]f the proof of a promise or contract, void under the statute of frauds, is essential to maintain the action, there may be no recovery.' Pacurib v. Villacruz, 183 Misc.2d 850, 861, 705 N.Y.S.2d 819, 827 (N.Y.Civ.Ct.1999) (emphasis added); see also Dwight v. Tobin, 947 F.2d 455, 460 (11th Cir.1991); McDabco, Inc. v. Chet Adams Co., 548 F.Supp. 456, 458 (D.S.C.1982) (it is a `well accepted doctrine that one cannot circumvent the Statute of Frauds by bringing an action in tort, when the tort action is based primarily on the unenforceable contract'); Weakly v. East, 900 S.W.2d 755 (Tex.Ct.App.1995). This is so, because, `[i]f a plaintiff was allowed to recover the benefit of a bargain already *1220 barred by the statute of frauds, the statute of frauds would become meaningless.' Sonnichsen v. Baylor University, 47 S.W.3d 122, 127 (Tex.Ct. App.2001). `Thus, the statute of frauds bars a [tort] claim when a plaintiff claims as damages the benefit of the bargain that he would have obtained had the promise been performed.' Id. (emphasis added).
"....
"The issue is squarely presented in this case. The Holmans' recovery  whether under the breach-of-contract theory or under any of the tort theories  turns on the existence of an oral promise to record a release as to tract II, the proof of which is barred by the Statute of Frauds."
852 So.2d at 699-700.
A & A and Anderson's allegation in the instant case is not that the defendants breached an assumed duty to process the SBA application with due care. Instead, the amended complaint alleges that Adkinson and Southland Bank were negligent or wanton in "failing to provide to Plaintiffs a $500,000 line of credit once the [SBA] had guaranteed the loan." This is an allegation that defendants violated a duty to assume or extend a loan. This is essentially a breach of a contractual duty to perform under a loan agreement, not of an assumed duty of care. However, as argued by the defendants in their motions for a JML and on appeal, and as noted above, there is no contractual duty in this case because any purported contract "to provide to Plaintiffs a $500,000 line of credit once the [SBA] had guaranteed the loan"  i.e., a commitment to lend  violated the Statute of Frauds. Therefore, the plaintiffs could not maintain their negligence or wantonness claim on this ground, and the trial court erred in failing to grant the motion for a JML.

Conclusion
The defendants were entitled to a JML on all the plaintiffs' claims. The claims thus should not have been submitted to the jury, and we reverse the trial court's judgment and enter a judgment in Southland Bank and Adkinson's favor. Our holding pretermits discussion of the other arguments made by the defendants.
REVERSED AND JUDGMENT RENDERED.
SEE, LYONS, WOODALL, STUART, BOLIN, and PARKER, JJ., concur.
COBB, C.J., and MURDOCK, J., concur in the result.

On Application for Rehearing
PER CURIAM.
Although the application for rehearing filed by A & A Drywall Supply Company, Inc., and Chadwick E. Anderson does not persuade us that on original consideration of this appeal we overlooked or misapprehended any points of law or facts, see Rule 40(b), Ala. R.App. P., we wish to address one point raised in their application. A & A and Anderson take exception to this Court's noting, in stating the procedural history of the case in its opinion on original submission, that "[t]he defendants then appealed to this Court; the case was referred to appellate mediation, which was ineffective." Southland Bank v. A & A Drywall Supply Co., [Ms. 1060204, Dec. 12, 2008] 21 So.3d 1196, 1202 (Ala.2008) (emphasis added). Citing Rule 8, Ala. R.App. Med., A & A and Anderson argue that the facts that the case was referred to mediation and that the mediation was unsuccessful are confidential, and that the mediation program "is supposed to be completely separate from the Court and Clerk's offices." A & A and Anderson further argue that because the Court was *1221 aware that the case went to mediation, the Court must have been "aware of confidential facts regarding the parties' appellate mediation" and that the Court gained this information "through personal knowledge." Thus, A & A and Anderson request that the members of this Court recuse themselves from this case and that a special court be appointed to hear this appeal de novo.
Rule 8, Ala. R.App. Med., states, in part:
"Except as otherwise required by law, the appellate mediation program operates under the rules of confidentiality as provided below.
"All information disclosed in the course of screening for mediation, referral to mediation, and mediation ... shall be deemed confidential and shall not be divulged by anyone involved in the mediation program or in attendance at the mediation except as permitted under this Rule, by statute, or by the Alabama Rules of Appellate Procedure.
"There shall be no reference, whatsoever, in any appellate motions, briefs, or argument to the appellate mediation program or to the fact that the appeal was mediated or that mediation reached an impasse except in those cases where mediation was partially successful and disclosure is necessary for a complete statement of the case. It is the responsibility of the counsel to bring this exception to the rules to the attention of the clerk's office or the mediation office. Failure to do so may result in a waiver of this exception.
"....
"The phrase, `information disclosed in the course of screening for mediation, referral to mediation, and mediation,' as used in this Rule, shall include, but not be limited to: (1) views expressed or suggestions made by another party with respect to a possible settlement of the dispute; (2) admissions made by another party in the course of the mediation proceedings; (3) proposals made or views expressed by the mediator; (4) the fact that another party had or had not indicated a willingness to accept a proposal for settlement made by the mediator; and (5) all records, reports, or other documents received by a mediator while serving as mediator."
Thus, Rule 8 provides for the confidentiality of certain aspects of mediation and the mediation process. With the exception of "those cases where mediation was partially successful and disclosure is necessary for a complete statement of the case," Rule 8 prohibits the parties from referencing in their materials filed in this Court whether the appeal was referred to mediation and the outcome of the mediation. Rule 8 does not, however, prohibit the members of this Court from knowing merely whether a case was referred to appellate mediation and subsequently reinstated on the appellate docket. In describing the confidentiality of appellate mediation, Rule 55(d), Ala. R.App. P., states: "[T]he bare fact that a settlement has or has not been reached as a result of mediation shall not be considered confidential." Consistent with this provision of Rule 55(d), Ala. R.App. P., as to cases referred to appellate mediation, this Court's records indicate that a case has been returned from the mediation docket and that the appellate time standards resumed upon the reinstatement of the case on the appellate docket. See Rule 6(a), Ala. R.App. Med. Additionally, this Court may order a case to appellate mediation after it has been submitted for review. Rule 3(c), Ala. R.App. Med.; Rule 55(a), App. R.App. P.
Concern over the lapse of time between the filing of the notice of appeal and the release of an opinion in this appeal motivated *1222 the explanatory statement in the original opinion that "the case was referred to appellate mediation, which was ineffective." Other than having knowledge that the case was referred to mediation and then reinstated on the appellate docket after mediation was apparently unsuccessful, no member of this Court had access to any confidential information concerning the mediation, such as who took what position, what settlement offers, if any, were made, or who was responsible for the mediation not resulting in a settlement.
This Court is mindful of the necessity for information concerning mediation to remain confidential. Members of the Court, as a matter of internal procedure, do not have any access whatsoever to any information regarding the mediation of a particular case other than whether the case was referred to appellate mediation and whether it was subsequently reinstated on the appellate docket.
APPLICATION OVERRULED.
COBB, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.
NOTES
[1] It appears from the record that Watt worked for an entity called "The Mortgage Resource Group."
[2] The estoppel claim was later integrated into the contract claim and was not presented to the jury as a separate action.
[3] The complaint also sought damages for wrongful interference with business relationships; this claim was later dismissed.
[4] The SBA guarantee states that the lender must "[c]lose the Loan in accordance with the terms and conditions of this Authorization."
[5] It appears that the jury was instructed on both breach of contract and breach of an implied contract. The distinction between the two claims does not alter our analysis, because "[a] contract implied in fact requires the same elements as an express contract, and differs only in the `method of expressing mutual assent.'" Ellis v. City of Birmingham, 576 So.2d 156, 157 (Ala.1991) (quoting Berry v. Druid City Hosp. Bd., 333 So.2d 796, 799 (Ala. 1976)).
[6] The compensation agreement recites that 15 U.S.C. § 642 "requires disclosures concerning fees."
[7] A signature line for the "Applicant," A & A, is signed by Anderson. Watt signed the signature line for The Mortgage Resource Group. Southland Bank is listed as the "lender," and the form is signed by Adkinson.
[8] Other evidence in the record indicates that it is undisputed that A & A paid the sum to Watt for preparing the application and supporting paperwork.
[9] Anderson admitted at trial that he did not pay Southland Bank directly for a loan commitment; however, he testified that he had paid Watt:

"[Defendants' counsel:] Did you pay to Southland Bank directly any money as compensation to Southland Bank for making a commitment to loan you that money from the SBA?
"[Anderson:] I paid Cindy Watt one thousand dollars for the SBA loan.
"[Defendants' counsel:] Did you pay any money to Southland Bank?
"[Anderson:] I paid the check to Cindy Watt.
"[Defendants' counsel:] I presume when you say you paid it to Cindy Watt, that the answer to my question with regard to Southland Bank was no?
"....
"[Anderson:] I did not pay Southland Bank any money."
[10] Because we conclude that the agreement is not in writing, and there is no note or memorandum thereof expressing the consideration that is in writing, there is no need to determine whether any writing is "subscribed by the party to be charged therewith" or, if a writing is subscribed by Adkinson, whether he was "lawfully authorized in writing." Ala. Code 1975, § 8-9-2.
[11] We express no opinion as to whether the fraud allegations in the complaint comply with Rule 9(b).
[12] George v. Associated Doctors Health & Life Insurance Co., 675 So.2d 860 (Ala.1996), and White v. State Farm Fire & Casualty Co., 953 So.2d 340 (Ala.2006), cited by the plaintiffs in their brief, are inapposite. George involved a representation that an insurance policy was a "better deal" than the policy the plaintiff held. In George, we noted that, under prior caselaw, this Court had held that an insurance agent's statement that his company's policy would provide an insured with better coverage could constitute a misrepresentation. 675 So.2d at 862. No promise to perform a future act was involved in that case. In White, we held that an insurance agent's representation that an insured could perform storm-damage repairs was a misrepresentation of existing fact; specifically, we held that the agent's statement was an authorization and not a "misrepresentation as to an event to take place in the future." White, 953 So.2d at 352.
[13] Sonmor testified the normal "practice" or "procedure" would be for a loan committee to approve a loan before it is sent to the SBA, but that "there is no requirement that I know of for that."
[14] The defendants preverdict motion for a JML did not call the trial court's attention to the issue whether the Statute of Frauds also barred the plaintiffs' promissory-fraud claim. Therefore, we address the merits of the promissory-fraud claim notwithstanding Bruce v. Cole, 854 So.2d 47, 58 (Ala.2003) ("an oral promise that is void by operation of the Statute of Frauds will not support an action against the promisor for promissory fraud").
[15] We note that, although the jury was instructed generally on negligence and the liability of principals for the acts of their agents, no specific instruction explaining negligent training or supervision  including a definition of "incompetent"  was given. Instead, the jury was simply given a verdict form that requested a verdict on "negligent failure to train and/or supervise." No party raises an issue on appeal regarding the jury instructions.
[16] Adkinson denies telling the plaintiffs that Southland Bank would approve the loan if the SBA guaranteed it; however, for purposes of appeal, we accept Anderson's testimony as true.
[17] Courts in this state have previously made no distinction between claims of wrongful supervision and claims of wrongful training: "After reviewing Alabama caselaw, we see no distinction between claims of wrongful supervision and claims of wrongful training. We, therefore, treat the cases addressing wrongful supervision as applicable to claims of wrongful training." Zielke v. AmSouth Bank, N.A., 703 So.2d 354, 357 n. 1. (Ala.Civ.App.1996) (plurality opinion) (cited in Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 940 (Ala. 2006), and Jackson v. Cintas Corp., 391 F.Supp.2d 1075, 1100 (M.D.Ala.2005)).